STEPHAN WEISS AND DONNA KARAN WEISS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weiss v. Commissioner
Docket No. 27946-90
United States Tax Court
T.C. Memo 1993-228; 1993 Tax Ct. Memo LEXIS 228; 65 T.C.M. (CCH) 2768; May 24, 1993, Filed *228 Decision will be entered under Rule 155. For petitioners: Mervin M. Wilf. For respondent: Mae J. Lew. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: Respondent determined a deficiency in and additions to petitioners' 1986 Federal income tax as follows: Additions to Tax Deficiency
Sec. 6653(a)(1)(A)
Sec. 6659
$ 102,475.00
[1]$ 5,123.75 $ 30,682.80
Respondent also determined that petitioners' underpayment of Federal income tax was substantial and attributable to a tax-motivated transaction within the meaning of section 6621(c); [1] accordingly, respondent determined that the annual rate of interest payable on petitioners' entire underpayment was 120 percent of the adjusted rate established under section 6621(b). *229 The issues for decision for taxable year 1986 are: (1) Whether petitioners are entitled to a charitable contribution deduction pursuant to section 170 for 450 gravesites donated to the New Hope Baptist Church. We hold that they are. (2) What is the fair market value of the donated property for purposes of section 170. We hold that the fair market value of the 450 gravesites is equal to petitioners' cost in acquiring the gravesites. (3) Whether petitioners are entitled to a deduction for tax consulting fees pursuant to section 212(3). We hold that they are not. (4) Whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a). We hold that they are not. (5) Whether petitioners are liable for the addition to tax for a valuation overstatement pursuant to section 6659 as determined by respondent. We hold that they are but only on that portion of the underpayment attributable to a valuation overstatement. (6) Whether petitioners' underpayment of Federal income tax is subject to the increased rate of interest provided by section 6621(c). We hold that that portion of petitioners' underpayment attributable to a valuation overstatement within the *230 meaning of section 6659 is subject to this increased rate of interest. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by reference. At the time they filed their petition, petitioners resided in New York, New York. All references to petitioner in the singular refer to petitioner Donna Karan Weiss, a/k/a Donna Karan. Introduction to Background Facts
In 1986, petitioner purchased a limited partnership interest in Ellis Arthur Partnership, and via the partnership, participated in an exchange and contribution program involving 450 finished gravesites situated in a cemetery entitled Green Haven Memorial Gardens, Inc. As explained in more detail herein, the exchange and contribution program consisted of petitioner's exchange of unimproved land located within the cemetery for finished gravesites which she thereafter donated to a charitable organization. For taxable year 1986, petitioner reported a capital gain on the exchange of the unimproved land for the finished gravesites and claimed a charitable contribution deduction for the donation of the finished gravesites. The issues currently before the Court stem primarily from these tax consequences *231 surrounding petitioner's participation in the exchange and contribution program. Forest Green Venture Gravesite Exchange and Contribution Program
Sometime prior to 1982, a New York limited partnership entitled Forest Green Venture (FGV) organized and facilitated a gravesite exchange and contribution program involving a cemetery located in Monmouth County, New Jersey. In most respects, this exchange and contribution program resembles the one in which petitioner participated; however, the cemeteries and years involved differ. In 1982, the Internal Revenue Service (IRS or Service) entered a settlement agreement with FGV relating to the gravesite exchange and contribution program. The IRS therein allowed a charitable contribution deduction to each FGV partner participating in the exchange and contribution program for years before and including 1982 in an amount equal to the cemetery's retail sales price for the finished gravesites, less an 18-percent discount. After FGV and the IRS entered this settlement agreement, each FGV partner participating in the exchange and contribution program reported its resulting tax consequences pursuant to this settlement. Each partner reported *232 a capital gain on the exchange of unimproved land for finished gravesites in an amount equal to the difference between the basis in the unimproved land and the sales price (less an 18-percent discount) per finished gravesite multiplied by the number of gravesites received. Each partner also reported a charitable contribution deduction equal to the cemetery's sales price for the number of finished gravesites received and then donated, less an 18-percent discount. E&D Investors and D&E Investors Exchange and Contribution Programs
In November 1983, Ellis Elgart, a certified public accountant, formed a Pennsylvania limited partnership entitled E&D Investors, and in May 1985 formed another Pennsylvania limited partnership entitled D&E Investors. Elgart, E&D Investors, and D&E Investors held limited partnership interests in FGV. E&D Investors and D&E Investors participated in an exchange and contribution program of gravesites similar to the one in which the partners of FGV participated and in which petitioner ultimately participated, except that the years and cemeteries involved differ. The litigation involving the exchange and contribution program facilitated by E&D Investors *233 is reported at Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67. Green Haven Memorial Gardens, Inc.
Since 1965, Green Haven Memorial Gardens, Inc. (Green Haven), has operated a cemetery located in Mahoning County, Ohio. Those associated with Green Haven describe the cemetery as a beautiful, peaceful, and well-maintained resting place. Green Haven plats approximately 1,100 adjacent gravesites per acre. Between the years 1965 and 1986, the majority of Green Haven's sales of gravesites were to individuals purchasing one or two gravesites on a pre-need basis. The owner of Green Haven stated that gravesites are normally sold to individuals purchasing for their personal use and that gravesites are not sold on a resale basis. The listed retail price of a gravesite in Green Haven varied depending upon its location within the cemetery. In 1986, the retail price of a single gravesite in Green Haven ranged from $ 560 to $ 900; however, most sold for $ 595 less a pre-need discount of $ 100. In addition to the price of a gravesite, purchasers were required by the State of Ohio to pay a fee *234 toward a perpetual care fund equal to 10 percent of the gross sales price of the burial lot purchased. As part of its solicitation efforts, Green Haven periodically offered pre-need discounts of $ 100 off the listed retail price of a gravesite or offered free gravesites and other low cost items to entice purchasers. The development cost in 1986 for a single gravesite ranged from $ 16 to $ 20. If a purchaser received a free gravesite, he or she was not required to pay a fee toward the perpetual care fund required by the State of Ohio, as there was no sales price. The above-referenced promotional tactics tended to stimulate purchasers' spending on other services provided by Green Haven; e.g., other gravesites, vaults, memorials, and interment services. In October 1984, as part of a promotional device, Green Haven sold 50 gravesites, with a listed retail price of $ 500, to The Islamic Society of Greater Youngstown for $ 250 per gravesite. This sale was the only bulk sale made by Green Haven as of the present time. In August 1987, Green Haven agreed to make 20 additional burial spaces available to The Islamic Society at $ 250 per gravesite plus 10 percent for perpetual care. *235 Ellis Arthur Partnership and Exchange and Contribution Program
For purposes of facilitating a gravesite exchange and contribution program involving Green Haven, Elgart and Arthur Dickler, both principals of the accounting firm of Elgart, Dickler and Co., organized Ellis Arthur Partnership (E&A) in 1986 as a general partnership pursuant to the laws of the State of Pennsylvania. The general partnership thereafter converted to a limited partnership on June 2, 1986; Elgart and Dickler became its general partners, and Dickler became the initial limited partner. Thirty-one persons or entities purchased full or fractional limited partnership interests in E&A in 1986 for approximately $ 11,000 per partnership unit. [2] In July 1986, E&A submitted an application to the IRS to be registered as a tax shelter and thereafter received a tax shelter registration number. *236 In early 1986, E&A began negotiating with Green Haven to implement a gravesite exchange and contribution program, and in April 1986 agreed to purchase approximately 24 acres of unimproved land located within the cemetery for $ 93,280. E&A had the right to exchange this unimproved land for finished gravesites located within the cemetery at the rate of 1,200 finished gravesites per acre and for a fee of $ 15 per gravesite. Green Haven participated in the exchange and contribution program in the hopes that it would generate additional business through sales of other products and services provided by Green Haven. Green Haven used the proceeds from the April 1986 sale to develop a new garden, the Garden of Praise, to be used in the exchange and contribution program. E&A had the right to transfer to FGV both the unimproved land it acquired from Green Haven and its right to exchange such with Green Haven for finished gravesites. Pursuant thereto, E&A transferred approximately 17 acres of the unimproved land to FGV in exchange for a 5.5-percent limited partnership interest of $ 92,500 in FGV. E&A had the right to withdraw this property from FGV to exchange for finished gravesites located *237 within Green Haven at the rate of 1,200 gravesites for each acre of unimproved land exchanged. For the years 1986 to 1991, E&A permitted its partners to withdraw the unimproved property from Green Haven held by FGV, which a partner could thereafter hold or exchange with Green Haven for finished gravesites at the rate of 450 gravesites per partnership unit. The investors were entitled to accelerate the donation program by withdrawing, exchanging, and donating a larger number of gravesites than 450. Partners electing to exchange unimproved land for finished gravesites had the option of holding the finished gravesites or donating them to a charity of their choice, including a charity preselected by Green Haven. If a partner participated in the exchange program, he or she would be required to pay a fee of $ 32 per gravesite, of which $ 1.50 would be retained by E&A, $ 15.50 would be forwarded to FGV for processing the exchange of unimproved land for finished gravesites, and $ 15 would be forwarded to Green Haven for processing the finished gravesites. A member of a church that acquired a free gravesite was required to pay Green Haven a record and deed preparation fee in the amount *238 of $ 60 and a perpetual care fund fee in the amount of $ 49.50 per gravesite. If Green Haven were directed to transfer a gravesite to a donee other than one preselected by Green Haven and Elgart, the investor was required to pay the fee for perpetual care immediately upon the transfer of the gravesite to the investor. Upon using a gravesite, the recipient was also required to pay an interment fee at the listed retail price charged by Green Haven. Following an investor's contribution, Green Haven would issue a deed to each donee church indicating which gravesites a specific partner had donated. When a donee church transferred a gravesite to a member of its congregation, Green Haven would then reissue a permanent deed to the recipient. On its books, Green Haven recorded the charitable organization as the owner of donated gravesites and then adjusted such upon a transfer of a gravesite to the ultimate recipient. Green Haven elected to document the transfer of gravesites involved in the exchange and contribution program in the above-indicated manner for administrative reasons. Ohio law prohibits speculation in gravesites, and an individual must be licensed in order to sell graves. *239 Neither Elgart, Dickler, E&A, nor petitioners ever had a license to sell gravesites in Ohio. Appraisal Report
In 1986, Elgart commissioned Harry R. Arneson, Jr., of Arneson and Associates, Fargo, North Dakota, to appraise a single gravesite situated within Green Haven. By an appraisal report dated December 9, 1986, Arneson determined that the fair market value of a single gravesite located within Green Haven was $ 423. Arneson's report was given to the investors in E&A, including petitioner, for use in reporting the value of gravesites for tax purposes. Fee Paid to Elgart, Dickler, and Co.
Pursuant to a retainer agreement, each investor purchasing a limited partnership interest in E&A was required to pay a fee to Elgart, Dickler, and Co. in the amount of $ 14,600 per partnership unit. A limited partner was required to pay this fee regardless of whether he or she elected to participate in the exchange and contribution program and was required to pay a higher fee upon electing to exchange and donate more than 450 gravesites. Pursuant to the retainer agreement, Elgart, Dickler and Co.'s duties consisted of reviewing personal income tax projections, determining the *240 tax effects of the exchange and contribution program, and discussing such with investors or their advisers. Elgart stated that the $ 14,600 fee was charged for notifying investors and donees of the exchange and contribution program, facilitating the exchange of unimproved land for finished gravesites, receiving and transferring fees to FGV, preparing the partnership's tax return for 1986, and arranging for an appraiser and donee churches to complete Forms 8283, an appraisal form on which a donee acknowledged the receipt of a contribution. Pursuant to Elgart, the $ 14,600 fee also included costs for any potential meetings with the IRS and any unknown expenses that might occur in the future. In 1986, Elgart principally performed accounting and tax services for his accounting firm. E&A Investors Participation in Exchange and Contribution Program
Each of the limited partners in E&A elected to participate in the exchange and contribution program in 1986 and donated a total of 11,250 finished gravesites, all situated within the Garden of Praise, to churches selected by the investors from a list compiled by Green Haven. We find that the listed retail price of a finished gravesite *241 located in the Garden of Praise was $ 495 as of the donation date. Green Haven did not issue deeds to FGV, E&A, or the limited partners in E&A for conveying finished gravesites to such entities or persons. [3]
To date, 63 of the 11,250 gravesites donated by the investors in E&A have been passed on to church members. To date, no persons have been interred in the Garden of Praise, and several of the ultimate recipients of the gravesites requested that Green Haven transfer their interests to a gravesite located in another part of the cemetery. Petitioner's Purchase of Investment and Participation in Exchange and Contribution Program
On September 3, 1986, petitioner purchased a one-unit limited partnership interest in E&A, and paid E&A the amount of $ 14,400 which represented a fee of $ 32 per gravesite for processing the exchange of unimproved *242 land for 450 finished gravesites. On this same date, petitioner paid Elgart, Dickler and Co. the amount of $ 14,600 pursuant to the retainer agreement. Petitioner did not receive an itemized bill from Elgart, Dickler and Co. detailing the services which she received from the accounting firm in 1986. On December 30, 1986, petitioner paid an appraisal fee in the amount of $ 100 to Harry R. Arneson for preparation of the appraisal report received by petitioners dated December 9, 1986. By a letter dated December 16, 1986, E&A requested from FGV a withdrawal of unimproved property on petitioner's behalf to be exchanged with 450 improved cemetery lots located within Green Haven. On December 17, 1986, FGV sent a list to Green Haven indicating, inter alia, that petitioner was donating 450 finished gravesites to the New Hope Baptist Church located in Youngstown, Ohio, and included therein a check representing a $ 15 fee per site for processing the exchange. On December 29, 1986, petitioner donated 450 finished gravesites, all situated within the Garden of Praise, to the New Hope Baptist Church, a charity selected by petitioner from the list compiled by Green Haven. Green Haven did not *243 issue a deed to petitioner conveying the 450 finished gravesites to her but did issue a deed, transmitted by a letter, to the New Hope Baptist Church dated December 29, 1986, for the 450 finished gravesites conveyed on petitioner's behalf. Green Haven acknowledged the donation of these gravesites to the church by a letter to petitioner dated December 29, 1986, which included a copy of the deed issued to the church. By a letter dated January 5, 1987, the New Hope Baptist Church acknowledged the receipt of petitioner's donation, and by a letter dated January 15, 1987, informed its congregation of the availability of free gravesites. As of the present time, none of the gravesites donated by petitioner has been given to church members or used for burials. Petitioners never visited Green Haven and did not know the location of the New Hope Baptist Church. Petitioners and Their Knowledge of E&A Investment and the Exchange and Contribution Program
Petitioner, a successful fashion designer, relies upon petitioner husband on all financial and business matters. Petitioner husband has had extensive financial and business experience involving fiscal planning and the negotiation of *244 contracts and has experience in a family business in the manufacture of theatrical products. Neither petitioner has any special knowledge or experience in investing in real estate ventures. Petitioner husband acquired petitioner's investment in E&A without consulting petitioner, and other than signing the appropriate papers, petitioner had no involvement therein or knowledge of its details. Petitioners never met or corresponded with Elgart or Dickler by letter or otherwise in regard to petitioner's investment in E&A. Prior to purchasing the investment, petitioner husband reviewed the appraisal document prepared by Harry R. Arneson dated December 9, 1986, and found this report thorough and impressive. Petitioners also received a copy of the "Ellis Arthur Partnership Cemetery Real Estate Venture" showing the tax effects of the purchase of a full unit and a half unit during the year 1986 and a copy of the "Ellis Arthur Partnership Projection - 1987" which reflects the tax effects of an investment in E&A based on expected changes in the Code in 1987. In deciding to invest in E&A, petitioner husband relied more on the advice he obtained from petitioners' accountants, Lewis Braff *245 and Co., New York, New York, than he did on investment documents that he received. Robert Stillman, of Lewis Braff and Co., reviewed E&A's prospectus and spoke with Elgart on four to five occasions regarding the mechanics and tax ramifications involving an investment in E&A and the exchange and contribution program. Of the information conveyed to Stillman by Elgart, Elgart informed Stillman of the settlement between FGV and the IRS regarding a similar exchange and contribution program. Upon Stillman's advice, petitioner purchased a limited partnership interest in E&A and elected to participate in the exchange and contribution program in 1986. Petitioner husband stated that he and petitioner regularly relied on Lewis Braff and Co. for investment advice and felt comfortable relying on the firm regarding the E&A investment program because a similar gravesite exchange and contribution program, i.e., the FGV program, had already been approved by the IRS. Petitioner husband stated that he and petitioner were not in favor of tax shelters, and Stillman stated that the firm consistently advised their clients to avoid investments involving high tax risks. Petitioners' 1986 Federal *246 Tax Return
Lewis Braff & Co. prepared petitioners' 1986 Federal income tax return and carefully reviewed such with petitioner husband. The firm sent an unitemized bill to petitioners for services rendered in 1986, which included a fee for the time Stillman spent advising petitioner husband of the tax consequences surrounding the E&A investment and the exchange and contribution program. On their 1986 Federal tax return, pursuant to Stillman's advice, petitioners reported that each of the 450 finished gravesites had a fair market value of $ 423, as appraised by Arneson, and that the basis of the unimproved land exchanged for such equaled $ 16,501; therefore, petitioners reported a long-term capital gain of $ 173,849 on the exchange of the unimproved land for finished gravesites. The basis of the unimproved land equals the partnership's basis in the land prior to distribution to petitioners ($ 2,101) plus the acquisition costs incurred by petitioners in the amount of $ 14,400; i.e., fee of $ 32 per gravesite paid to E&A. Petitioners also claimed a charitable contribution deduction pursuant to section 170 in the amount of $ 190,350 for the donation of the 450 gravesites to the New *247 Hope Baptist Church, and pursuant to Stillman's advice, claimed a tax consulting fee deduction in the amount of $ 14,600 for the sum paid to Elgart, Dickler, and Co.
Notice of Deficiency
In the statutory notice of deficiency issued to petitioners, respondent (1) disallowed the charitable contribution deduction for the property donated to the New Hope Baptist Church because it did not qualify as a proper deduction under any Internal Revenue Code provision, including section 170; (2) disallowed the tax consulting fee deduction because such costs represented a nondeductible capital expenditure; (3) determined that petitioners were liable for additions to tax for negligence pursuant to section 6653 and for a valuation overstatement pursuant to section 6659; and (4) determined that petitioners' entire underpayment of income tax was subject to an increased rate of interest pursuant to section 6621(c). OPINION Issue 1. Entitlement to a Charitable Contribution Deduction
We must first address the issue of whether petitioners are entitled to a charitable contribution deduction pursuant to section 170 for the donation of the 450 gravesites to the New Hope Baptist Church on *248 December 29, 1986. Respondent initially challenges petitioners' entitlement to this deduction on the basis that petitioner never owned the 450 finished gravesites. Respondent contends that petitioner never owned the 450 finished gravesites because Green Haven failed to convey the gravesites to petitioner via a formal deed. Concededly, in order to be entitled to the claimed charitable contribution deduction, petitioner must have been the owner of the finished gravesites. In the application of a Federal revenue act, State law controls in determining the ownership of property or rights thereto. United States v. Mitchell, 403 U.S. 190, 197 (1971); Burnet v. Harmel, 287 U.S. 103, 110 (1932). Pursuant to the law of the State of Ohio, it does not appear that a formal deed is required to transfer a gravesite or cemetery lot. See Fraser v. Lee, 8 Ohio App. 235, 240 (1917). Pursuant to section 1721.07 of the Ohio Revised Code Annotated (Anderson 1985), a cemetery is authorized to adopt its own rules for conveying burial lots. In the instant case, rather than issuing deeds to FGV, E&A, or petitioner *249 for conveyance of the 450 finished gravesites, Green Haven, for administrative efficiency, opted to document the transfer of the gravesites by issuing a deed to the donee church which would be reissued if and when a church member acquired a free gravesite. It is clear from the outset that all of the parties involved in the exchange and contribution program recognized petitioner as the owner of the properties. Letters written by E&A to FGV, by FGV to Green Haven, by Green Haven to the New Hope Baptist Church, by the church to petitioner, and by Green Haven to petitioner confirm that each of the parties involved in the exchange and contribution program recognized petitioner as the owner and donor of the finished gravesites. Further, petitioner parted with her own funds as the result of which the New Hope Baptist Church received finished gravesites. Accordingly, we find that the absence of a formal deed documenting the transfer of the 450 finished gravesites to petitioner is not significant and hold that upon contributing the 450 finished gravesites to the church, petitioner made a substantive donation for which she is entitled to a deduction. See Weintrob v. Commissioner, T.C. Memo. 1990-513, *250 supplemental opinion at T.C. Memo. 1991-67. We note that on the same grounds as discussed above, we reject respondent's alternative contention that Green Haven, rather than petitioner, was the actual donor of the 450 finished gravesites to the New Hope Baptist Church. Issue 2. Fair Market Value of Donated Property
Having concluded that petitioners made a valid charitable contribution in 1986 upon donating the 450 gravesites to the New Hope Baptist Church, we now turn to the question of the amount of the deduction to which petitioners are entitled. The charitable contribution deduction allowed is limited to the fair market value of the property donated as of the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value of donated property other than money is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property that is the subject of a charitable contribution is an issue of fact to be resolved from *251 consideration of all the relevant evidence of record in the case. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). While we must consider the entire record, we have broad discretion to decide what facts are most important in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason". Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated Jan. 22, 1951. As is customary in valuation cases, petitioners and respondent rely heavily on expert opinion to support their respective positions regarding the fair market value of the donated property. Petitioners have submitted Harry R. Arneson, Jr., as their expert witness, and respondent has submitted Thomas P. Dwyer, [4] an engineer employed by the IRS, as his expert witness. We evaluate expert opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), *252 affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). As the trier of fact, we are not bound by an expert's opinion where it is contrary to our judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991), on appeal (8th Cir. 1991). Consequently, we will consider expert opinion to the extent that it assists us in resolving the issues presented by the instant case. IT&S of Iowa, Inc. v. Commissioner, supra at 508. In the instant case, as discussed herein, we reject the testimony of both parties' expert witnesses as to their conclusions regarding the fair market value of the 450 finished gravesites. *253 In the instant case, respondent contends that the fair market value of the 450 gravesites as of the donation date is $ 57.47 per site or equal to petitioner's cost in acquiring the gravesites, and petitioners contend that the fair market value is $ 448 per site. [5] The difference in the parties' respective values is attributable primarily to the disagreement between the parties as to the market which should be assumed in valuing these gravesites and the disagreement as to whether the property should be valued on a bulk or an individual basis. While section 170 and the regulations promulgated thereunder are silent as to these issues, the Estate and Gift Tax regulations, which have been recognized to be applicable for charitable contribution purposes, provide some guidance. Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Anselmo v. Commissioner, 80 T.C. 872, 881-884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Section 20.2031-1(b), *254 Estate Tax Regs. provides: Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property * * *. [Emphasis added.]
The provisions of section 25.2512-1, Gift Tax Regs., are almost identical. *255 Regarding the appropriate market to use for valuation purposes, a sale "to the public" refers in the normal situation to a sale to the retail customer who is the ultimate consumer of the property. Lio v. Commissioner, supra at 66; Anselmo v. Commissioner, supra at 882. A sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale, Goldman v. Commissioner, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966), and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved. Lio v. Commissioner, supra at 70. The defining of this appropriate retail market is a question of fact, Anselmo v. Commissioner, 757 F.2d at 1213, and necessitates our identifying the ultimate consumer of finished gravesites. Goldstein v. Commissioner, 89 T.C. 535, 544 (1987). In the instant case, the owner of Green Haven stated that gravesites are normally sold to individuals purchasing *256 for their personal use and that gravesites are not sold on a resale basis. The facts as they pertain to Green Haven support these conclusions in that in or prior to the years at issue, all of Green Haven's sales or exchanges of gravesites were to individuals for personal consumption, to an organization for use by its members, or to the investors in E&A for donation purposes. The record does not reveal that any of these purchasers held the gravesites for subsequent resale, and in fact does not reveal that gravesites are ever sold on a resale basis. We find that the most appropriate market in which to value the gravesites at issue is that market in which they are sold to and purchased by individuals for personal consumption. See, e.g., Broad v. Commissioner, T.C. Memo. 1986-340. Petitioners' expert witness has examined the proper market in arriving at a fair market value of the 450 gravesites at issue. Respondent's expert, however, determined the fair market value of the gravesites from the perspective of an investor purchasing gravesites based upon the anticipated income to be generated by resale of the gravesites; thus, he utilized the resale market. *257 Because respondent's expert has used an improper market in which to value the gravesites at issue, his analyses and conclusions regarding the fair market value of the gravesites as determined via this method are of no assistance for our purposes. Respondent contends that we accepted the income approach in Vesper v. Commissioner,T.C. Memo. 1989-358, to value property similar to the property at issue. The property presented for valuation in Vesper, however, differs from that presented in the instant case in that the taxpayers in Vesper donated unimproved land, rather than improved gravesites, to a city, which the city used to operate a cemetery. Unlike the property presented for valuation in the instant case, unimproved land for utilization by a cemetery could be sold in a resale market. Accordingly, respondent's reliance upon Vesper is inappropriate. Having identified the appropriate market to use for valuing the 450 gravesites at issue, we must next determine the price at which the gravesites would be exchanged between a willing seller and an ultimate consumer, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant *258 facts. Sec. 1.170A-1(c)(2), Income Tax Regs; sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Petitioners assert that the fair market value of each of the 450 gravesites is the retail price of a single gravesite sold to and purchased by an individual for personal consumption, which petitioners' expert witness concludes is $ 448 per site. Petitioners have presented no evidence of any sales involving 450 gravesites, or even a large multitude of gravesites, at the aggregate retail price of a single gravesite and, we as the fact finder do not believe that such an exchange would occur at this price between reasonable, knowledgeable parties. The record reveals that for promotional purposes, Green Haven sold gravesites primarily on a pre-need basis at a discount of $ 100 off the listed retail price, sold 50 gravesites at a discount of 50 percent off the listed retail price, exchanged 11,250 sites with the investors in E&A at a discount of approximately 96 percent off the listed retail price, [6] and periodically gave gravesites away, such being a low-cost item. Common sense tells us that a reasonable buyer with knowledge of these aforementioned facts would not purchase *259 450 gravesites at the aggregate retail price of a single gravesite and, therefore, an exchange of 450 gravesites would not occur between reasonable, knowledgeable parties at such a price. Accordingly, we reject petitioners' contention that the fair market value of the 450 gravesites at issue is equal to their aggregate retail price. In cases, as in the instant case, where both parties have made errors in valuation, the Court has made a determination of the fair market value of donated property based solely upon the taxpayer's cost. See Goldstein v. Commissioner, 89 T.C. 535, 547 (1987); Lio v. Commissioner, 85 T.C. 56, 71 (1985), *260 affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Chiu v. Commissioner, 84 T.C. 722, 734-736 (1985). [7] Under similar circumstances in Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67, and Broad v. Commissioner, supra, involving the valuation of multiple gravesites in Pennsylvania which were donated to charitable organizations, we rejected the experts' valuations and found the fair market value of the gravesites to be equal to the taxpayers' cost. In the instant case, petitioners acquired the 450 finished *261 gravesites 12 to 13 days prior to the donation date at a cost of $ 16,501. Petitioners have presented no evidence indicating that the fair market value of the 450 donated gravesites exceeded petitioner's cost in acquiring them. [8] Deductions are strictly a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed. Rule 142(a); Indopco, Inc. v. Commissioner, 503 U.S.    , 112 S. Ct. 1039, 1043 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Having failed to do so, we conclude that the fair market value of the donated property on the date of donation was the cost of the property to petitioner; i.e., $ 16,501. *262 Petitioners also claim and respondent concedes that if we redetermine the value of the donated gravesites for purposes of petitioners' charitable deduction, petitioners are entitled to have the same value used for determining the reported capital gain on the exchange of unimproved gravesites for improved gravesites. As we have determined a fair market value different from that claimed by petitioners on their 1986 Federal tax return, a corresponding adjustment to their reported capital gain is to be reflected in the Rule 155 computation. Issue 3. Deduction for Tax Consulting Fees
Section 212(3) allows a deduction for all ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax. Generally, ordinary and necessary expenses paid for Federal income tax planning are deductible under section 212(3). Zmuda v. Commissioner, 79 T.C. 714, 725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). In the instant case, respondent determined that petitioner's payment of $ 14,600 to Elgart, Dickler, and Co. represented a capital expenditure, namely petitioner's cost of acquiring *263 her investment in E&A and, thus, was not deductible. Petitioners contend, however, that the amount paid to the accounting firm was for the rendition of tax advice and therefore was deductible pursuant to section 212(3). It is clear from the record, however, that the primary services rendered to petitioners by Elgart in connection with the transactions involved herein consisted of facilitating the exchange and contribution program, rather than tax consulting and planning services. That is, Elgart stated that the retainer fee was charged for notifying investors and donees of the exchange and contribution program, facilitating the exchange of unimproved land for finished gravesites, receiving and transferring fees to FGV, and arranging for an appraiser and donee churches to complete Forms 8283. Further, Elgart, Dickler and Co. assessed a higher retainer fee if a partner elected to accelerate his exchange and contribution activity. Petitioners never met or corresponded with Elgart or Dickler at any time and received no itemized bill from the firm detailing any tax advising services rendered on their behalf in 1986. In 1986, Elgart performed accounting and tax services principally *264 for Elgart, Dickler, and Co. Petitioner husband testified that he relied primarily on Lewis Braff and Co. for tax advice with regard to petitioner's investment in E&A and in regard to the exchange and contribution program. Petitioners received a bill from Lewis Braff and Co. for taxable year 1986 for services rendered, including tax advice regarding the exchange and contribution program. While Elgart did render tax advice to Robert Stillman, of Lewis Braff and Co., on four or five occasions in 1986 on petitioners' behalf which might otherwise be an allowable deduction under section 212, the record is void of any other tax services provided by the firm which justify the $ 14,600 payment as being paid for tax consulting services. Further, petitioners have failed to prove what portion of the $ 14,600 payment to the firm can be allocated to the tax advice rendered to their accountant on their behalf, and the record is void of any evidence upon which we can unilaterally make such a determination. Again, deductions are strictly a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed. Rule 142(a); Indopco, Inc. v. Commissioner, 112 S.Ct. at 1039; *265 New Colonial Ice Co. v. Helvering, supra at 440. Having failed to do so, we hold that petitioners are not entitled to any deduction attributable to such expenses.
Issue 4. Additions to Tax for Negligence
Respondent determined that petitioners' underpayment of income taxes in 1986 was due to negligence or intentional disregard of rules or regulations and, accordingly, determined that petitioners were liable for the negligence additions to tax pursuant to section 6653(a)(1) and (2). Negligence under section 6653(a) means lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that they are not liable for the negligence additions to tax. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners contend that they are not liable for this addition to tax because they reasonably relied upon the advice of their accountants, Lewis Braff and Co., *266 regarding how to properly report the tax consequences of the exchange and contribution program. Reasonable reliance on the advice of competent tax counsel fully informed as to the relevant facts has been held to be sufficient to avoid imposition of the addition to tax for negligence. Weis v. Commissioner, 94 T.C. 473, 487 (1990); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.     (1991); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); Woodbury v. Commissioner, 49 T.C. 180, 200 (1967). Petitioner, a fashion designer, relies upon her husband on all financial and business matters, and aside from signing the appropriate papers, had no involvement in acquiring an investment in E&A or participating in the exchange and contribution program. Neither petitioner has any special knowledge or experience in investing in real estate ventures, and while petitioner husband has extensive business and financial experience, he and petitioner regularly relied upon *267 Lewis Braff and Co. for investment advice. Petitioners were not in favor of tax shelters, and Lewis Braff and Co. consistently advised its clients to avoid investments involving high tax risks. Based primarily upon the firm's advice, petitioner husband purchased an investment in E&A and elected to participate in the gravesite exchange and contribution program. Petitioner husband felt comfortable with the E&A exchange and contribution program because FGV's similar program had been approved by the IRS. The testimony of Robert Stillman indicates that Lewis Braff and Co. was well informed as to the relevant facts and tax consequences regarding the E&A exchange and contribution program. Based upon the advice of Lewis Braff and Co., petitioners erroneously claimed a tax consulting fee deduction for the amount paid to Elgart, Dickler and Co. and claimed a charitable contribution deduction in an erroneous amount for the donation of the 450 gravesites to the New Hope Baptist Church. The record reveals that the charitable contribution deduction was also based upon FGV's settlement with the IRS and Arneson's appraisal report. Further, Lewis Braff and Co. not only advised petitioners as *268 to the reporting of this investment for tax purposes, but also prepared petitioners' 1986 Federal tax return which contained these erroneous deductions and carefully reviewed the return with petitioner husband. Based upon the aforementioned facts, we hold that petitioners are not liable for the negligence additions to tax pursuant to section 6653(a)(1) and (2). Issue 5. Addition to Tax for a Valuation Overstatement
Respondent determined that petitioners' 1986 underpayment of income tax equaled or exceeded $ 1,000 and was attributable to a "valuation overstatement" pursuant to section 6659 and, therefore, petitioners were liable for an addition to tax in an amount up to 30 percent of their underpayment so attributable. Sec. 6659(b). In the case of any underpayment attributable to a "valuation overstatement" with respect to charitable deduction property, the amount of the addition to tax is equal to 30 percent of the underpayment so attributable. Sec. 6659(f)(1). A valuation overstatement occurs where the value of any property or adjusted basis of property claimed on any return is 150 percent or more of the value or adjusted basis that is determined to be the correct amount. *269 Sec. 6659(c)(1). For purposes of calculating both their charitable contribution deduction and the taxable gain recognized on the exchange of unimproved land for the 450 finished gravesites, petitioners claimed that the finished gravesites had a value of $ 190,350. Because we have determined that the correct fair market value of the 450 finished gravesites was $ 16,501, a valuation overstatement has occurred in the instant case. Accordingly, if after making the Rule 155 computation, the amount of petitioners' underpayment that is attributable to this valuation overstatement equals or exceeds $ 1,000, petitioners are liable for the addition to tax pursuant to section 6659 on the portion of the underpayment so attributable. Sec. 6659(b). Issue 6. Section 6621(c) Additional Interest
Section 6621(d) provides for interest at the rate of 120 percent of the normal rate (under section 6601) on a "substantial underpayment attributable to tax motivated transactions". A substantial underpayment attributable to a tax-motivated transaction means any underpayment of tax which is attributable to one or more tax-motivated transactions if the amount of the underpayment for such year *270 so attributable exceeds $ 1,000. Sec. 6621(d)(2). A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(d)(3)(A)(i). In the instant case, we have determined that a valuation overstatement has occurred within the meaning of section 6659(c). If after making the Rule 155 computation, the portion of petitioners' underpayment so attributable exceeds $ 1,000, we hold that petitioners are liable for the increased rate of interest provided by section 6621 on that portion of their underpayment so attributable. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence pursuant to section 6653(a)(1)(B).↩
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In addition to petitioner, the following persons or entities purchased limited partnership interests in E&A in 1986: Cliff Botwin, Harvey Brice, Chuck Buell, Gerald Carrus, Lee Dayton, Edwin Goldenberg, Harry Goldenberg, Roy C. Green, Vincent Harmann, Barry Hazan, Albert Heinz, S. J. Hirsh, Richard Kerr, Eugene Kestensbaum, Sherwin Littman, Robert McManigal, Jr., Anthony A. Martino, Augustus L. Pasquarella, Harold Potler, Robert Reich, Nathan Rosen, Ronald Schlesinger, Shapiro Family Partnership, Jeffrey Simons, Jon Sirlin, Jeffrey Stevenson, William Strauss, Michael Wiener, Carol Williams, Alan Zingmond.↩
3. On Dec. 26, 1986, and Dec. 29, 1987, FGV and E&A by separate deeds reconveyed the 24 acres of unimproved land acquired from Green Haven in April 1986 to Green Haven.↩
4. Petitioners object to the admissibility of the testimony and report of respondent's expert witness, Mr. Dwyer, on the grounds that Mr. Dwyer does not qualify as an expert pursuant to Rule 143(f). After reviewing Mr. Dwyer's qualifications, we overrule petitioners' objection.↩
5. In his initial apprisal report dated Dec. 9, 1986, Harry R. Arneson appraised the gravesites at $ 423 per gravesite, and it is this value that petitioners used for tax purposes in 1986. Inexplicably, Arneson's expert witness report indicates he has appraised the gravesites at $ 448 per gravesite.↩
6. Green Haven exchanged 11,250 gravesites with a listed retail price of $ 495 with the investors in E&A for approximately $ 19 in consideration; thus, at a discount of approximately 96-percent off the listed retail price. The $ 19 consideration consisted of a $ 15 processing fee per finished gravesite and a basis of approximately $ 4 per unfinished gravesite exchanged.↩
7. See also Schachter v. Comissioner, T.C. Memo. 1986-292; Lampe v. Commissioner, T.C. Memo. 1985-236; Theodotou v. Commissioner, T.C. Memo. 1985-181; Talebi v. Commissioner, T.C. Memo. 1985-180↩.
8. For this reason, the instant case is distinguishable from Waterman v. Commissioner, T.C. Memo. 1975-209 and Grossman v. Commissioner, T.C. Memo. 1973-219, on which petitioners rely to support their contention that petitioner's cost in acquiring the finished gravesites is not indicative of their fair market value. That is, unlike the record in the instant case, the records in Waterman and Grossman↩ contained evidence indicating that the fair market value of the property presented for valuation exceeded the taxpayer's cost in acquiring the property.