ROSS KLAVAN AND KATHLEEN KLAVAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Klavan v. Commissioner
Docket Nos. 3916-90, 2181-91, 16970-91
United States Tax Court
T.C. Memo 1993-299; 1993 Tax Ct. Memo LEXIS 306; 66 T.C.M. (CCH) 68; July 13, 1993, Filed *306 Decision will be entered under Rule 155. For petitioners: Mervin M. Wilf and Gary P. Brady. For respondent: Drita Tonuzi and Dante D. Lucas. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Petitioners Ross and Kathleen Klavan, docket No. 3916-90
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6661 1986
$ 32,384
[1] $ 1,619.20
$ 4,544.50
Respondent also determined that all or part of their underpayment was substantial and attributable to a tax-motivated transaction within the meaning of section 6621(c); [2] accordingly, respondent determined that the annual rate of interest on the portion of the underpayment so attributable was 120 percent of the adjusted rate established under section 6621(b). *307 Petitioners Edward E. and Helaine F. Lucente, docket No. 2181-91
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6661
1985
$ 95,228
[1] $ 4,761
$ 23,807
Respondent also determined that all or part of their underpayment was substantial and attributable to a tax-motivated transaction within the meaning of section 6621(c); accordingly, respondent determined that the annual rate of interest on the portion of the underpayment so attributable was 120 percent of the adjusted rate established under section 6621(b). Petitioners Scott R. and Patricia B. Sanders, docket No. 16970-91
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(1)(A)
Sec. 6659
1985
$ 21,136
[1] $ 1,057
$ 6,340
1986
23,055
[1] $ 1,153
6,917
Respondent also determined that their underpayments were substantial and attributable to a tax-motivated transaction *308 within the meaning of section 6621(c); accordingly, respondent determined that the annual rate of interest on their underpayments was 120 percent of the adjusted rate established under section 6621(b). After stipulations involving petitioners Scott R. and Patricia B. Sanders, the issues presented for decision are: (1) Whether petitioners are entitled to a charitable contribution deduction pursuant to section 170 for gravesites they donated to section 170(c) charitable organizations in the years at issue. We hold that they are. (2) What the fair market value of the donated property is for purposes of section 170. We hold that the fair market value of the gravesites is equal to petitioners' cost in acquiring the donated property. (3) Whether the issue regarding petitioners' entitlement to a capital gains deduction pursuant to section 1202(a) on the exchange of unimproved land for gravesites is properly before the Court. We hold that it is not. (4) Whether petitioners are entitled to a deduction for tax consulting fees pursuant to section 212(3). We hold that they are in accordance with this opinion. (5) Whether petitioners are liable for additions to tax for negligence pursuant *309 to section 6653(a). We hold that they are not. (6) Whether petitioners are liable for the addition to tax for a substantial understatement pursuant to section 6661. We hold that they are. (7) Whether each petitioner's underpayment of Federal income tax is subject to the increased rate of interest provided by section 6621(c). We hold that that portion of petitioners' underpayments attributable to a valuation overstatement within the meaning of section 6659 is subject to this increased rate of interest. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by reference. At the time they filed their petition, petitioners Ross and Kathleen Klavan resided in New York, New York; petitioners Edward E. and Helaine F. Lucente resided in New Canaan, Connecticut; and petitioners Scott R. and Patricia B. Sanders resided in Philadelphia, Pennsylvania. At the commencement of trial, petitioners Scott R. and Patricia B. Sanders, docket No. 16970-91, stipulated with respondent that all issues pertaining to them were to be decided in accordance with the other two consolidated cases at docket Nos. 3916-90 and 2181-91. These stipulations will be given effect in *310 the Rule 155 computation, and we do not further address the case of petitioners Scott R. and Patricia B. Sanders. Introduction to Background Facts
Between 1985 and 1986, the Klavans and petitioner Edward Lucente each purchased a limited partnership interest in D&E Investors (D&E), and via the partnership participated in an exchange and contribution program involving finished gravesites situated in a cemetery called Good Shepherd Memorial Park. As explained in more detail herein, the exchange and contribution program consisted of petitioners' exchange of unimproved land located within the cemetery for finished gravesites which petitioners thereafter donated to charitable organizations. For the taxable years at issue, petitioners reported a capital gain on the exchange of the unimproved land for the finished gravesites and claimed a charitable contribution deduction for the donation of the finished gravesites. The issues currently before the Court stem primarily from the tax consequences surrounding petitioners' participation in the exchange and contribution program. Forest Green Venture Gravesite Exchange and Contribution Programs
Sometime prior to 1982, a New York *311 limited partnership entitled Forest Green Venture (FGV) organized and facilitated a gravesite exchange and contribution program involving a cemetery located in Morganville, New Jersey. In most respects, this exchange and contribution program resembles the one in which petitioners participated; however, the cemeteries involved and sometimes the years involved differ. In 1982, the Internal Revenue Service (IRS or Service) entered a settlement agreement with FGV relating to the gravesite exchange and contribution program. The IRS therein allowed a charitable contribution deduction to each FGV partner participating in the exchange and contribution program for years before and including 1983 in an amount equal to the cemetery's retail sale price for the finished gravesites, less an 18-percent discount. Thereafter, each FGV partner participating in the exchange and contribution program reported its resulting tax consequences pursuant to this settlement. Each partner reported a long-term capital gain on the exchange of unimproved land for finished gravesites in an amount equal to the difference between the basis in the unimproved land and the retail sale price (less an 18-percent discount) *312 per finished gravesite multiplied by the number of gravesites received. Each partner also reported a charitable contribution deduction equal to the cemetery's retail sale price for the number of finished gravesites received and then donated, less an 18-percent discount. E&D Investors and Ellis Arthur Partnership Exchange and Contribution Programs
In 1983, Ellis Elgart, a certified public accountant, formed a Pennsylvania limited partnership entitled E&D Investors, and in 1986 formed another Pennsylvania limited partnership entitled Ellis Arthur Partnership. Elgart, E&D Investors, and Ellis Arthur Partnership held limited partnership interests in FGV. E&D Investors and Ellis Arthur Partnership participated in an exchange and contribution program of gravesites similar to the one in which the partners of FGV participated and in which petitioners ultimately participated, except that the cemeteries involved and sometimes the years involved differ. The litigation involving the exchange and contribution program facilitated by E&D Investors is reported at Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67. *313 The litigation involving the exchange and contribution program facilitated by Ellis Arthur Partnership is reported at Weiss v. Commissioner, T.C. Memo. 1993-228. Good Shepherd Memorial Park
Good Shepherd Memorial Park, Inc., operates a cemetery located in Spartanburg County, South Carolina, called Good Shepherd Memorial Park (Good Shepherd). Good Shepherd Memorial Park, Inc., has been wholly owned by James Douglas Cheatwood, Sr. (Cheatwood), and managed by his son, Chip Cheatwood, since its incorporation in July 1982. Those familiar with Good Shepherd describe it as a beautiful, well-operated cemetery. Good Shepherd maintains a record book in its offices which indicates the ownership of gravesites; the cemetery is not required to record the ownership of gravesites elsewhere. In 1985 and 1986, the retail sale price to an individual purchaser of a single gravesite located in Good Shepherd was $ 495. The focus of Good Shepherd's marketing efforts is its family protection plan, which consists of marketing gravesites on a pre-need basis. The family protection plan includes gravesites, burial services, headstones, vaults, and interment fees *314 for a husband and wife (and for any child dying at or before the age of 18). In 1985, the cost of the plan was approximately $ 4,490; if each item or service had been sold individually, the cost would have been approximately $ 7,000. Good Shepherd periodically uses other promotional devices to stimulate the sale of its products and services, including giving away gravesites. Cheatwood stated that Good Shepherd often utilized this promotional device prior to 1986 but discontinued using it when it entered its arrangements with D&E in 1985. Prior to 1983, Good Shepherd often sold gravesites for less than their listed retail price. D&E
Elgart and Arthur Dickler, both certified public accountants and principals of the accounting firm of Elgart, Dickler and Co., organized D&E in May 1985 as a limited partnership pursuant to the laws of the State of Pennsylvania. Elgart and Dickler became the general partners of D&E. In May or June 1985, D&E submitted an application to the IRS to be registered as a tax shelter, and in July 1985 received a tax shelter registration number. Thirty-three persons purchased full or fractional limited partnership interests in D&E for approximately *315 $ 9,000 per partnership unit. [3]
D&E and Exchange and Contribution Program
Cheatwood met Elgart in March 1985 and began negotiating the development of an exchange and contribution program involving gravesites situated within Good Shepherd. Cheatwood participated in the program exclusively to generate additional business through sales of other cemetery products and services. In early April 1985, Good Shepherd received a sales agreement *316 from Elgart in the mail, and after Good Shepherd reviewed the agreement with its attorney, Ronald Colvin, Elgart visited the cemetery in late April 1985. At that time, Elgart and Good Shepherd signed an agreement of sale dated April 30, 1985. The agreement of sale provided that Elgart and Dickler agreed to purchase 11.13 acres of unimproved land located within the cemetery for $ 55,000, of which $ 2,500 was payable upon signing the agreement and the remainder payable at the settlement, which was to occur no later than June 20, 1985. [4] On the same date that Elgart and Dickler and Good Shepherd executed the agreement of sale, April 30, 1985, they executed another agreement which provided that Good Shepherd would exchange, upon request, the 11.13 acres of unimproved land for finished gravesites at the rate of 1,200 finished gravesites per acre and for a fee of $ 15 per gravesite. In this latter agreement, Good Shepherd agreed not to sell any gravesites for less than $ 495. Good Shepherd thereafter developed approximately 13,200 gravesites on the 11.13 acres; the total development cost to Good Shepherd per acre ranged from approximately $ 24,000 to $ 25,000. *317 Elgart, acting as the general partner of D&E, transferred the rights he and Dickler obtained with Good Shepherd to FGV in exchange for a 2.85-percent limited partnership interest of $ 84,000 in FGV. D&E had the right to withdraw this unimproved land from FGV to exchange for finished gravesites located within Good Shepherd at the rate of 1,200 finished gravesites for each acre of unimproved land exchanged. Good Shepherd did not deed the 11.13 acres of unimproved property to Elgart and Dickler or to D&E, and neither Elgart, Dickler, nor D&E deeded the property to FGV. Instead, Good Shepherd transferred the unimproved land directly to FGV by a deed dated July 8, 1985; the date on this deed was corrected by affidavit in December 1985 to reflect that the deed was executed on June 28, 1985. For the years 1985 to 1990, D&E permitted its partners to withdraw the unimproved property held by FGV, which a partner could thereafter hold or exchange with Good Shepherd for finished gravesites at the rate of 225 gravesites per partnership unit. The investors were entitled to accelerate the donation program by withdrawing, exchanging, and donating a larger number of gravesites than 225. Partners *318 electing to exchange unimproved land for finished gravesites then had the option of holding the finished gravesites or donating them to a charity of their choice, including a charity preselected by Good Shepherd and Elgart. If an investor elected to donate the gravesites, Good Shepherd would issue a certificate of ownership to each donee church indicating which gravesites a specific partner had donated. If a partner participated in the exchange program in 1985, he or she would be required to pay a fee of $ 32 per gravesite, of which $ 17 would be forwarded to FGV for processing the exchange of unimproved land for finished gravesites and $ 15 would be forwarded to Good Shepherd for processing the finished gravesites. If a partner participated in the exchange program in 1986, he or she would be required to pay a fee of $ 38 per gravesite, of which $ 23 would be forwarded to FGV and $ 15 to Good Shepherd. Appraisal Report
In 1985 and 1986, Elgart commissioned Cedric W. Morrison, of Morrison & Morrison, Tryon, North Carolina, to prepare an appraisal of a single gravesite situated within Good Shepherd. By an appraisal report dated April 7, 1986, Morrison determined that the *319 fair market value of a single gravesite located within Good Shepherd as of March 14, 1986, was $ 405.90. By an appraisal report dated February 16, 1987, Morrison determined that the fair market value of a single gravesite located within Good Shepherd as of November 11, 1986, was $ 405. In the aforementioned appraisal reports, Morrison indicated that he had considered the effect that a bulk sale would have upon the fair market value of a donation of gravesites. The reports contain Morrison's qualifications as an appraiser and contain specific, detailed information regarding Good Shepherd. Morrison's reports were given to the investors in D&E for use in reporting the value of gravesites for tax purposes. Each investor was required to pay a fee to Morrison in the amount of $ 100 for a copy of the reports. Fee Paid to Elgart, Dickler, and Co.
Pursuant to a retainer agreement, each investor purchasing a limited partnership interest in D&E was also required to pay a fee to Elgart, Dickler, and Co. in the amount of $ 7,800 per partnership unit in 1985 and $ 9,950 in 1986. A limited partner was required to pay this fee only if he or she elected to participate in the exchange *320 and contribution program and was required to pay a higher fee upon electing to exchange and donate more than 225 gravesites. Elgart rendered the same amount of services to those purchasing a full or a fractional unit of investment in D&E. Pursuant to the retainer agreement, Elgart, Dickler and Co.'s duties consisted of reviewing personal income tax projections, determining the tax effects of the exchange and contribution program, and discussing them with investors or their advisers. Elgart stated that the retainer fee was charged for advising partners or their advisers regarding how to properly report their participation in the exchange and contribution program, notifying investors and donees of the exchange and contribution program, facilitating the exchange of unimproved land for finished gravesites, receiving and transferring fees to FGV, preparing D&E's partnership's tax returns and maintaining its bookkeeping records, and arranging for an appraiser and donee churches to complete Forms 8283, an appraisal form on which a donee acknowledged the receipt of a contribution. According to Elgart, the fee also included costs for any potential meetings with investors regarding their *321 participation in the exchange and contribution program in subsequent years. D&E Confidential Private Placement Memorandum
D&E supplied a copy of its confidential private placement memorandum to each investor, including petitioners. This memorandum devotes several pages to discussing the tax risks involved in investing in D&E and in participating in the exchange and contribution program. The memorandum specifically states the following: The Partnership's tax counsel believes that a Partner who claims a charitable contribution for the donation of gravesites to charity will be challenged by the Service to prove the nature and the amount of such deduction * * * * * * Such expenses [i.e., pursuant to retainer agreement with Elgart, Dickler and Co.] will qualify as deductible expenses under section 212 if they are reasonable in amount and are paid for professional advice in connection with the production or collection of income for the management, conservation, or maintenance of property held for the production or income, or in connection with the determination, collection or refund of any tax. To the extent such services may be deemed to be expenses incurred in acquiring *322 an interest in the Partnership, such expenses are non-deductible. Each investor should consult with his personal tax advisor to determine whether the above described fees, depending upon the nature and extent of services to each Partner, are deductible on the Partner's personal tax return.
D&E's Participation in Exchange and Contribution Program
The majority of the limited partners in D&E elected to participate in the exchange and contribution program in 1985 and 1986. By a letter dated December 6, 1985, D&E requested from FGV a withdrawal of unimproved land on behalf of the investors in D&E. The December 1985 letter indicates that the investors would thereafter exchange this unimproved land with Good Shepherd on December 30, 1985, for 6,300 finished gravesites and then donate the gravesites to charitable organizations. In 1985, the partners donated the gravesites to churches selected by the investors from a list compiled by Good Shepherd and Elgart. On December 30, 1985, FGV deeded the unimproved property involved in the 1985 exchange and contribution program to Good Shepherd. By a letter dated December 16, 1986, D&E requested from FGV another withdrawal of unimproved *323 land on behalf of the investors in D&E. The December 1986 letter indicates that the investors would thereafter exchange this unimproved land with Good Shepherd on December 21, 1986, for 4,995 finished gravesites and then donate the gravesites to charitable organizations. In 1986, the partners donated the gravesites to churches selected by the investors from a list compiled by Good Shepherd and Elgart. On July 16, 1987, FGV deeded the portion of the unimproved property involved in the 1986 exchange and contribution program to Good Shepherd. Good Shepherd issued no deeds or certificates of ownership to the investors in D&E documenting the transfer of gravesites to them; however, it did issue certificates of ownership to donee churches regarding the gravesites donated to them in 1985 and 1986. In the initial months within which the program was offered, approximately 600-700 church members acquired free gravesites; approximately one-half of those persons purchased Good Shepherd's family protection plan. Cheatwood stated that Good Shepherd would not repurchase the 13,200 gravesites involved in the 1985 and 1986 exchange and contribution program. Mr. Lucente's Involvement in *324 D&E
In August 1985, Mr. Lucente purchased two units of investment in D&E and participated in the exchange and contribution program in December 1985. Mr. Lucente purchased this investment solely to participate in the exchange and contribution program. In late 1985, Mr. Lucente paid Elgart, Dickler and Co. the amount of $ 15,600, i.e., $ 7,800 for each unit purchased, pursuant to the retainer agreement. Mr. Lucente did not receive an itemized bill from the accounting firm detailing the services rendered on his behalf in 1985. By a letter dated December 6, 1985, D&E requested from FGV a withdrawal of unimproved land on Mr. Lucente's behalf. The letter indicates that Mr. Lucente would thereafter exchange the unimproved land with Good Shepherd on December 30, 1985, for 450 finished gravesites and would then donate them to the Boiling Springs First Baptist Church located in Spartanburg, South Carolina. On December 30, 1985, Mr. Lucente donated 450 gravesites to the church as selected by Elgart. Good Shepherd acknowledged the transfer of gravesites to the church by a letter to Mr. Lucente dated December 30, 1985. Good Shepherd issued a certificate of ownership dated December 30, *325 1985, to the Boiling Springs First Baptist Church for the 450 gravesites. Good Shepherd verified Mr. Lucente's donation by a letter to the church dated December 30, 1985, and indicated therein that a copy of the certificate of ownership was enclosed. The church acknowledged the receipt of Mr. Lucente's donation by a letter to him dated February 5, 1986, and indicated therein that it had received a certificate of ownership for the gravesites. Mr. Lucente received an unsigned copy of Morrison's report dated April 7, 1986, in which Morrison determined that the fair market value of a gravesite located within Good Shepherd as of March 14, 1986, was $ 405.90. Lucentes' Knowledge of D&E Exchange and Contribution Program
Petitioner Edward Lucente received a civil engineering degree from Carnegie Mellon University, and is currently a member of the university's business advisory board to a graduate school and a member of its board of trustees. After graduation, Mr. Lucente worked for AT&T and a small engineering company before he began working for IBM in Pittsburgh, Pennsylvania. Mr. Lucente was employed by IBM for 30 years, was a member of its corporate management board, and was *326 the president of IBM's World Trade Asia Corp. Mr. Lucente retired from IBM in February 1991 and is currently the senior vice president of marketing with Northern Telecom, a company which manufactures and supplies digital switches for telecommunications equipment. Mr. Lucente does not consider himself an expert in the real estate industry or the cemetery business and does not consider himself a sophisticated investor. Prior to investing in D&E, Mr. Lucente spoke with Elgart regarding the details of investing in D&E and of participating in its exchange and contribution program. Elgart spoke with Mr. Lucente in 1985 and 1986 on approximately six different occasions, and in the years following 1985 and 1986, a few more than six occasions when the IRS began questioning the exchange and contribution program. Mr. Lucente also contacted his personal financial adviser, Richard Spoor, of Spoor, Behrins, Campbell & Young, Inc., regarding investing in D&E and participating in the gravesite exchange and contribution program. Spoor personally advised Mr. Lucente on all financial matters for which Mr. Lucente paid Spoor, Behrins, Campbell & Young, Inc., a set annual fee. On Mr. Lucente's *327 suggestion, Elgart contacted Spoor regarding whether Mr. Lucente should invest in such a program and had all information sent to him. On two or three occasions, Elgart and Spoor's assistant met regarding the tax reporting of an investment in D&E and the participation in the exchange and contribution program. Elgart informed Spoor of FGV's prior settlement with the IRS regarding a similar gravesite exchange and contribution program. For approximately 2 months, Spoor or his assistant reviewed investment documents, including the FGV settlement agreement. Spoor also contacted outside tax counsel and ran some pro forma tax returns to see the implications on the Lucentes' tax return. Spoor stated that he proceeded cautiously and carefully in advising Mr. Lucente on the investment. Based upon his independent investigation, Spoor advised Mr. Lucente to make the investment and advised him to participate in the exchange and contribution program in 1985 and again in 1986. Spoor recommended the investment to Mr. Lucente in part due to its tax benefits. Mr. Lucente wanted assurance prior to investing in D&E that the exchange and contribution program would be approved by the IRS. Elgart *328 informed Mr. Lucente of the FGV settlement with the IRS and that several of his clients holding interests in FGV had reported their participation in the exchange and contribution program pursuant thereto. Elgart informed Mr. Lucente that the settlement did not, however, assure that the IRS would not challenge the program again in the future. Spoor informed Mr. Lucente of the tax benefits he would receive from investing in D&E and assured him that there were no tax risks involved because a similar program had been approved by the IRS. Lucentes' Notice of Deficiency and Background Information
Elgart prepared the Lucentes' Federal income tax return for taxable year 1985. On their 1985 Federal tax return, the Lucentes reported a long-term capital gain of $ 165,555 on their exchange with Good Shepherd of unimproved land for 450 gravesites. The Lucentes reported that the unimproved land had a basis equal to $ 17,100 and that the gravesites had a fair market value of $ 182,655; i.e., $ 405.90 for each of the 450 gravesites. On Schedule A, they claimed a charitable contribution deduction in the amount of $ 182,655 for the donation of the gravesites to Boiling Springs First Baptist *329 Church, an organization exempt from tax pursuant to section 501(c)(3). They also claimed a tax consulting fee deduction in the amount of $ 15,600 for the fee paid to Elgart, Dickler and Co.
Attached to their 1985 tax return was a copy of the letter written by the church acknowledging the receipt of Mr. Lucente's donation, a copy of the certificate of ownership issued by Good Shepherd to the church, and a copy of the letter written by Good Shepherd to Mr. Lucente confirming that the transfer had occurred. Also attached was a Form 8283 signed by an authorized agent of the Boiling Springs First Baptist Church acknowledging the receipt of gravesites. Cedric W. Morrison signed the Form 8283 as the qualified appraiser of the property, and by signing such certified that he was "not the donor, the donee, a party to the transaction, employed by or related to any of the foregoing persons, or a person whose relationship to any of the foregoing persons would cause a reasonable person to question [his] independence as an appraiser." Respondent thereafter issued a notice of deficiency to the Lucentes for taxable year 1985 in which respondent disallowed the entire charitable contribution deduction *330 on the basis that the Lucentes had failed to establish, inter alia, that the deduction satisfied the requirements of section 170, and disallowed a portion of the tax consulting fee deduction in the amount of $ 7,800. Respondent also determined that the Lucentes were liable for the additions to tax for negligence pursuant to section 6653(a)(1) and (2), were liable for an addition to tax for a substantial understatement pursuant to section 6661, and were subject to the increased rate of interest provided by section 6621(c). The Lucentes filed a petition for redetermination of these deficiencies with this Court. By special leave of the Court, respondent amended the answer to their petition disallowing the full deduction claimed in 1985 for tax consulting fees in the amount of $ 15,600. As a result of fully disallowing this deduction, respondent increased the amount of the Lucentes' 1985 tax deficiency to $ 99,129, the amount of the addition to tax for negligence pursuant to section 6653(a)(1) to $ 4,956.20, the amount of the addition to tax for negligence pursuant to section 6653(a)(2) on the increased underpayment attributable to negligence, and the amount of the addition to tax *331 for a substantial understatement to $ 24,782, and asserted the increased rate of interest provided by section 6621(c). The Klavans' Involvement in D&E
The Klavans purchased a one-half unit of interest in D&E on June 4, 1985, were limited partners of D&E during 1986, and participated in the exchange and contribution program in 1985 and 1986. By a check dated October 25, 1986, the Klavans paid Elgart, Dickler, and Co. the amount of $ 10,272 for tax consulting services rendered in regard to their participation in the exchange and contribution program in 1986. The Klavans received a written, unitemized bill from Elgart, Dickler, and Co., dated November 1986 for professional services rendered entitled "Consultant's Fee". They also paid a separate fee to the firm for preparing their 1986 Federal income tax return. By a letter dated December 16, 1986, D&E requested from FGV a withdrawal of unimproved land on the Klavans' behalf. The letter indicates that the Klavans would then exchange the unimproved land with Good Shepherd on December 21, 1986, for 175 finished gravesites which would then be donated to the Buck Creek Baptist Church located in Chesnee, South Carolina. On December *332 26, 1986, the Klavans donated the 175 gravesites to the church. Good Shepherd acknowledged the transfer of gravesites to the church by a letter to the Klavans dated December 26, 1986. Mrs. Klavan stated that she and her husband never considered reselling the gravesites or donating them to a church in her area; her intention was always to donate them to churches selected by Elgart. Good Shepherd issued a certificate of ownership dated December 26, 1986, to the Buck Creek Baptist Church for the 175 gravesites. Good Shepherd verified the Klavans' donation by a letter to the church dated December 26, 1986, and indicated therein that a copy of the certificate of ownership was enclosed. The church acknowledged the receipt of the Klavans' donation by a letter to them dated December 26, 1986, and indicated therein that it had received a certificate of ownership for the gravesites. The Klavans received a copy of Morrison's report dated February 16, 1987, in which Morrison determined that the fair market value of a single gravesite located within Good Shepherd as of November 11, 1986, was $ 405. Klavan's Knowledge of Exchange and Contribution Program
Mrs. Klavan is currently a *333 writer with a background primarily in broadcast news. In 1973, Mr. Klavan received a journalism degree from New York University, and thereafter performed work related thereto. The Klavans do not consider themselves to be sophisticated businesspersons, and Mr. Klavan does not consider himself an expert in the real estate or cemetery business. The Klavans regularly make cash or tangible goods donations to churches. Mrs. Klavan had known Elgart 15 years prior to purchasing the investment in D&E and had regularly relied upon his financial advice. Elgart became Mrs. Klavan's accountant prior to her marriage to Mr. Klavan; thereafter, he became both Mr. and Mrs. Klavan's accountant. The Klavans had discussed investment possibilities with Elgart for several years prior to the D&E investment, and in 1985, Elgart informed them of the D&E exchange and contribution program. Mrs. Klavan had received assurance from Elgart that the program had already been approved by the IRS, and she did not feel it was necessary to contact independent tax counsel in regard to the investment. Mr. Klavan considered seeking the advice of an independent accountant or attorney but elected not to because he *334 trusted and respected Elgart's advice. The Klavans relied upon the advice of Elgart, one of his associates, and each other in connection with their investment in D&E. The Klavans invested in D&E solely for the tax benefits and not with any expectation of making a profit. Klavans' Notice of Deficiency and Background Information
Elgart, Dickler, and Co. prepared the Klavans' Federal income tax return for taxable year 1986. On their 1986 tax return, the Klavans reported a long-term capital gain of $ 63,332 on their exchange with Good Shepherd of unimproved land for 175 gravesites. The Klavans reported that the unimproved land had a basis equal to $ 7,701 and that the gravesites had a fair market value of $ 71,033; i.e., $ 405.90 for each of the 175 gravesites. On Schedule A, the Klavans claimed a charitable contribution deduction in the amount of $ 71,033 for the donation of the gravesites to the Buck Creek Baptist Church, an organization exempt from tax pursuant to section 501(c)(3). They also claimed a tax consulting fee deduction in the amount of $ 7,985 [5] for the fee paid to Elgart, Dickler, and Co. *335 Attached to their 1986 tax return was a copy of the letter written by the church acknowledging the receipt of the Klavans' donation, a copy of the certificate of ownership issued by Good Shepherd to the church, and a copy of the letter by Good Shepherd to petitioners confirming that the transfer had occurred. Also attached was a Form 8283 signed by an authorized agent of the Buck Creek Baptist Church acknowledging the receipt of the gravesites. Cedric W. Morrison signed the Form 8283 as the qualified appraiser of the property, and by doing so certified that he was "not the donor, the donee, a party to the transaction in which the donor acquired the property, employed by or related to any of the foregoing persons, or a person whose relationship to any of the foregoing persons would cause a reasonable person to question [his] independence as an appraiser." Respondent thereafter issued a notice of deficiency to the Klavans for taxable year 1986 in which respondent disallowed the entire charitable contribution deduction on the basis that they had failed to establish their entitlement to any portion of the deduction claimed under any provision of the Code. Respondent also determined *336 that the Klavans were liable for the additions to tax for negligence pursuant to section 6653(a)(1)(A) and (B), were liable for the addition to tax for a substantial understatement pursuant to section 6661, and were subject to the increased rate of interest provided by section 6621(c). The Klavans filed a petition for redetermination of this deficiency and additions to tax with this Court. By special leave of the Court, respondent amended the answer to their petition disallowing the deduction claimed by them in 1986 for tax consulting fees. As a result of disallowing this deduction, respondent increased the amount of the Klavans' 1986 tax deficiency to $ 36,296, the amount of the addition to tax for negligence pursuant to section 6653(a)(1)(A) to $ 1,814.20, the amount of the addition to tax for negligence pursuant to section 6653(a)(1)(B) on the increased underpayment attributable to negligence, and the amount of the addition to tax for a substantial understatement to $ 9,074, and asserted the increased rate of interest provided by section 6621(c). After the Klavans filed their petition for redetermination and prior to trial, their attorney requested from respondent a waiver *337 of the section 6661 addition to tax; respondent denied this request by a letter dated May 25, 1991. Respondent indicated within its May 1991 letter that the denial was premised upon respondent's inability to distinguish the facts of Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67, in which this Court held on the taxpayers' motion for reconsideration that they had failed to prove that the Commissioner had committed an abuse of discretion in refusing to waive the section 6661 addition to tax as determined against them. In the instant case, respondent indicated within the May 1991 letter that if any new facts arose during the course of trial preparation, respondent would reconsider the Klavans' waiver request. OPINION Issue 1. Entitlement to Charitable Contribution Deduction
Section 170(a) allows as a deduction a contribution or gift to any entity described in section 170(c), payment of which is made within the taxable year. Deductions are strictly a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S.    , 112 S. Ct. 1039, 1043 (1992); *338 New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). In the instant cases, Mr. Lucente donated 450 gravesites situated within Good Shepherd to the Boiling Springs First Baptist Church on December 30, 1985, for which he and his wife claimed a charitable contribution deduction in the amount of $ 182,655. On December 26, 1986, the Klavans donated 175 gravesites situated within Good Shepherd to the Buck Creek Baptist Church for which they claimed a charitable contribution deduction in the amount of $ 71,033. Respondent does not dispute that both the Boiling Springs First Baptist Church and the Buck Creek Baptist Church are entities described in section 170(c). On other grounds which we address seriatim, respondent contends that petitioners are not entitled to the charitable contribution deductions they claimed. a. Bona Fide Inter Vivos Gift We interpret many of the arguments raised by respondent on brief regarding petitioners' entitlement to these deductions as challenging whether petitioners have made bona fide inter vivos gifts to the donee churches in the years at issue. The essential elements of a bona fide inter vivos gift are: (1) A *339 donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; and (6) acceptance of the gift by the donee. Guest v. Commissioner, 77 T.C. 9, 15-16 (1981); Weil v. Commissioner, 31 B.T.A. 899, 906 (1934), affd. 82 F.2d 561 (5th Cir. 1936). Respondent does not dispute that petitioners were competent to make a gift or that the donee churches were capable of taking their gifts. Instead, respondent contends that petitioners never owned, transferred, or relinquished dominion and control over the gravesites and that the donee churches never accepted or had dominion and *340 control over the donated gravesites. 1. Ownership of Gravesites In the application of a Federal revenue act, State law controls in determining the ownership of property or rights thereto. United States v. Mitchell, 403 U.S. 190, 197 (1971); Burnet v. Harmel, 287 U.S. 103, 110 (1932). Respondent contends that petitioners did not own the gravesites because Good Shepherd did not convey them to petitioners via a deed or a certificate of ownership. It does not appear, however, that formal documentation is required to transfer a gravesite or cemetery lot in the State of South Carolina. Pursuant to section 39-55-125 of the Code of Laws of South Carolina 1976 Annotated (Law. Co-op), a cemetery must only maintain a record of every lot owner at its principal place of business. In the instant cases, Good Shepherd maintained such records and documented the transfers of the donated gravesites by issuing deeds to the donee churches. Accordingly, the absence of a formal document issued to petitioners transferring the gravesites to them is not significant. See Weiss v. Commissioner, T.C. Memo. 1993-228; *341 Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67. Respondent also contends that Good Shepherd remained the owner and thus the actual donor of the gravesites as the cemetery never relinquished dominion and control over the property. Good Shepherd entered an agreement with Elgart and Dickler, however, which provided that the cemetery would exchange these gravesites for unimproved land. The partners of D&E ultimately acquired this right and pursuant thereto, the Klavans and Mr. Lucente exchanged unimproved land with Good Shepherd for finished gravesites. Good Shepherd was obligated to comply with this exchange and in accordance therewith issued certificates of ownership to the donee churches on petitioners' behalf conveying the gravesites to the churches. Because Good Shepherd was required to and did relinquish dominion and control of the gravesites, it was not the owner of the donated gravesites. Respondent next contends that even assuming Good Shepherd relinquished dominion and control over the donated gravesites, petitioners never thereafter had dominion and control over the property. *342 The investors in D&E, however, had the option of either holding the finished gravesites they received in their exchanges with Good Shepherd or donating them to charities of their choice. While petitioners might not have intended to retain the gravesites or to donate them to charities other than those preselected by Elgart and Good Shepherd, they controlled their decision of whether to donate them and if so, to whom. We cannot conclude that petitioners never had dominion and control over the donated gravesites. The letters written between the parties facilitating the gravesite exchange and contribution program indicate clearly that all of the involved parties recognized petitioners as the owners and donors of the gravesites at the time the gravesites were donated. In order to receive the finished gravesites, petitioners relinquished unimproved land and paid a fee of $ 32 or $ 38 per finished gravesite, and in consideration for conveying the property to petitioners, Good Shepherd received the unimproved land and a $ 15 fee per gravesite. We hold that petitioners were the owners of the gravesites they donated in the years at issue. 2. Transfer of Gravesites by Petitioners *343 and Their Relinquishment of Dominion and Control
Each of the parties involved in the exchange and contribution program understood that petitioners intended to transfer gravesites situated within Good Shepherd to donee churches. The letters from D&E to FGV indicate that the transfers were to occur following the exchanges of unimproved land for finished gravesites. The letters from Good Shepherd to the churches, from Good Shepherd to petitioners, and from the churches to petitioners indicate that the transfers had in fact occurred. These facts signify that, in substance, petitioners transferred and relinquished dominion and control over the gravesites to the donee churches. 3. Churches' Acceptance of Gravesites and Their Exercise of Dominion and Control
Good Shepherd issued certificates of ownership to both the Boiling Springs Baptist Church in 1985 and the Buck Creek Baptist Church in 1986 documenting the conveyance of the donated gravesites to them on petitioners' behalf. The churches then acknowledged the receipt of these donations by letters to petitioners shortly after receiving the gravesites, and an authorized agent of each church signed the Forms 8283 attached *344 to petitioners' relevant tax returns verifying that the churches had received petitioners' donation of gravesites. Contrary to respondent's assertions, both the Boiling Springs Baptist Church and the Buck Creek Baptist Church accepted and exercised dominion and control over the gravesites donated by petitioners. 4. Conclusion Petitioners made bona fide inter vivos gifts upon their donation of gravesites in the years at issue. [6]
b. *345 Qualified Appraisal Reports Section 170(a)(1) provides that a charitable contribution deduction shall be allowed only if verified under regulations prescribed by the Secretary. The applicable regulations provide that for noncash charitable deductions in excess of $ 5,000, no deduction under section 170 shall be allowed unless certain substantiation requirements are met. Sec. 1.170A-13(c)(1), Income Tax Regs. On brief, respondent asserts that petitioners are not entitled to the charitable contribution deductions because they have failed to comply with these substantiation requirements. Petitioners contend that respondent raised this substantiation theory for the first time on brief and, therefore, the issue is not properly before the Court. It is a well-established rule that this Court will generally not address new issues raised for the first time in a party's brief if consideration of the theory will result in prejudice to the opposing party. Seligman v. Commissioner, 84 T.C. 191, 196-198 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Robertson v. Commissioner, 55 T.C. 862, 865 (1971); Philbrick v. Commissioner, 27 T.C. 346, 353 (1956); *346 Hettler v. Commissioner, 16 T.C. 528, 535 (1951); Wentworth Manufacturing Co. v. Commissioner, 6 T.C. 1201, 1208 (1946). We have held, however, that a new theory taken by respondent is not necessarily a "new issue" particularly where the new position merely makes the original determination more specific, is not inconsistent with the original determination, and does not result in an increased deficiency. McSpadden v. Commissioner, 50 T.C. 478, 493 (1968). Proceeding from the broad to the specific neither destroys the presumption of correctness attached to the deficiency determination nor shifts the burden of proof to respondent much less bars those contentions from consideration. Id. at 493; Spangler v. Commissioner, 32 T.C. 782, 793 (1959), affd. 278 F.2d 665 (4th Cir. 1960); Fleischmann v. Commissioner, 40 B.T.A. 672, 682 (1939); see also Handel v. Commissioner, T.C. Memo. 1992-355; Big "D" Development Corp. v. Commissioner, T.C. Memo. 1971-148, *347 affd. 453 F.2d 1365 (5th Cir. 1972). Respondent determined in the notice of deficiency issued to the Klavans that they were not entitled to a charitable contribution deduction for their donation of gravesites because they had failed to establish their entitlement to any portion claimed under any provision of the Code. In the notice of deficiency issued to the Lucentes, respondent likewise determined that they were not entitled to a charitable contribution deduction for the donation of gravesites because they failed to establish that the donation satisfied Code requirements. Respondent's theory that petitioners failed to satisfy the substantiation requirements of section 170 merely narrows the broad issue originally determined by respondent, is not inconsistent with respondent's original determinations, and does not increase the amount of petitioners' deficiencies. Therefore, the issue of whether petitioners have satisfied these substantiation requirements is not one that we are precluded from considering. The substantiation requirements contained in section 1.170A-13(c)(2)(1), Income Tax Regs., provide that in order to be allowed a charitable contribution *348 deduction, the taxpayer must: (1) Obtain a "qualified appraisal" for the property contributed; (2) attach a fully completed appraisal summary as defined in paragraph (c)(4); and (3) maintain records containing the information required by paragraph (b)(2)(ii). In the instant cases, the only basis upon which respondent challenges whether petitioners have satisfied these requirements is that they have failed to establish that they received a "qualified appraisal" as defined by section 1.170A-13(c)(3), Income Tax Regs.
Section 1.170A-13(c)(3), Income Tax Regs., provides that the term "qualified appraisal" means an appraisal that is: (1) Made not earlier than 60 days prior to the date of contribution nor later than the due date (including extensions) of the taxpayer's return; (2) is prepared, signed, and dated by a qualified appraiser; (3) includes specific, detailed information regarding the property contributed; and (4) does not involve a prohibited appraisal fee as defined by paragraph (c)(6). We have held that the requirement of a separate qualified appraisal report is directory and not procedural and mandatory, and that a taxpayer who substantially complies with the substantiation *349 requirements is entitled to the claimed charitable contribution deduction. Bond v. Commissioner, 100 T.C.    ,     (1993) (slip op. at 4). Both the Klavans and Mr. Lucente received a report prepared by Morrison, in which he determined the value of a single gravesite situated within Good Shepherd, indicating that his respective report was made no earlier than 60 days prior to the date of their contributions nor later than the due date (including extensions) of their tax returns. Both appraisal reports contain a description of Morrison's qualifications to appraise the particular property in issue and both contain specific, detailed information regarding the donated property in issue. By signing the Forms 8283 attached to petitioners' tax returns, Morrison certified that he was not the donor, donee, a party to the transaction, employed by or related to either the donor or donee, or a person whose relationship to any of the foregoing persons would cause a reasonable person to question his independence as an appraiser. Contrary to respondent's contentions, the record does not indicate that Morrison had any prohibited relationship to any of the parties involved in the D&E *350 exchange and contribution program. We hold that petitioners have substantially complied with this particular portion of the substantiation requirements and therefore are not, on this basis, disallowed the charitable contribution deductions claimed by them in the years at issue. c. Conclusion We hold that upon donating the gravesites to the donee churches in the years at issue, petitioners made substantive donations for which they are entitled to a deduction. See Weiss v. Commissioner, T.C. Memo. 1993-228; Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67. Issue 2. Fair Market Value of Donated Gravesites
Having concluded that petitioners made valid charitable contributions in the years in issue upon donating gravesites to qualified organizations for which they are entitled to a deduction, we now turn to the question of the amount of the deductions to which petitioners are entitled. The charitable contribution deduction allowed is limited to the fair market value of the property donated as of the date of the contribution. Sec. 1.170A-1(c)(1), Income *351 Tax Regs. The fair market value of donated property other than money is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property that is the subject of a charitable contribution is an issue of fact to be resolved from consideration of all the relevant evidence of record in the case. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). While we must consider the entire record, we have broad discretion to decide what facts are most important in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason". Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated Jan. 22, 1951. As is customary in valuation cases, petitioners and respondent rely heavily *352 on expert opinion to support their respective positions regarding the fair market value of the donated property. Petitioners have submitted the report of Harry R. Arneson, Jr., of Arneson and Associates, Fargo, North Dakota, as their expert witness, and respondent has submitted Reaves C. Lukens, Jr., of Reaves C. Lukens Co., Philadelphia, Pennsylvania. We evaluate expert opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). As the trier of fact, we are not bound by an expert's opinion where it is contrary to our judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). Consequently, we will consider expert opinion to *353 the extent that it assists us in resolving the issues presented by the instant case. IT&S of Iowa, Inc. v. Commissioner, supra at 508. In the instant cases, respondent contends that the fair market value of each of the gravesites involved in the 1985 and 1986 D&E exchange and contribution program is $ 14.22 per site, and petitioners contend that the fair market value of each is $ 504 in 1985, and $ 538 in 1986. The difference in the parties' respective values is attributable primarily to the disagreement between the parties as to the market which should be assumed in valuing these gravesites and the disagreement as to whether the property should be valued on a bulk or an individual basis. While section 170 and the regulations promulgated thereunder are silent as to these issues, the Estate and Gift Tax Regulations, which have been recognized to be applicable for charitable contribution purposes, provide some guidance. Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Anselmo v. Commissioner, 80 T.C. 872, 881-884 (1983), *354 affd. 757 F.2d 1208 (11th Cir. 1985); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Section 20.2031-1(b), Estate Tax Regs., provides: Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property * * *. [Emphasis added.]
The provisions of section 25.2512-1, Gift Tax Regs., are almost identical. Regarding the appropriate market to use for valuation purposes, a sale "to the public" refers in the normal situation to a sale to the retail customer who is the ultimate consumer of the property. Lio v. Commissioner, supra at 66; *355 Anselmo v. Commissioner, supra at 882. A sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale, Goldman v. Commissioner, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966), and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved, Lio v. Commissioner, supra at 70. The defining of this appropriate retail market is a question of fact, Anselmo v. Commissioner, 757 F.2d at 1213, and necessitates our identifying the ultimate consumer of finished gravesites, Goldstein v. Commissioner, 89 T.C. 535, 544 (1987). The record contains no evidence establishing that gravesites are ever sold on a resale basis, or indicating that the ultimate consumers of gravesites are individuals other than those who purchase gravesites for personal consumption. Respondent's expert, Mr. Lukens, testified that in his experience and based upon common knowledge, gravesites are not sold for resale. Similarly, *356 petitioners' expert witness, Mr. Arneson, stated that gravesites are not purchased for investment purposes but rather are purchased for use. Cheatwood, the owner of Good Shepherd, testified that Good Shepherd would not consider repurchasing the gravesites involved in the exchange and contribution program. In Weiss v. Commissioner, T.C. Memo. 1993-228, and in Broad v. Commissioner, T.C. Memo. 1986-340, both involving the donation of a large number of gravesites, we held that the most appropriate market in which to value gravesites was the market in which gravesites are sold to and purchased by individuals for personal consumption. In accord therewith and on the basis of the record presented in the instant cases, we hold the same in the instant cases. Petitioners' expert witness has examined the proper market in arriving at a fair market value of the donated gravesites at issue. [7] Respondent's expert, however, determined the fair market value of the gravesites from the perspective of an investor purchasing gravesites based upon the anticipated income to be generated by the gravesites; thus, he utilized the resale market. *357 Because respondent's expert has used an improper market in which to value the gravesites at issue, his analyses and conclusions regarding the fair market value of the gravesites as determined via this method are of no assistance for our purposes. Respondent contends nevertheless that we accepted the income approach in Vesper v. Commissioner, T.C. Memo. 1989-358, to value property similar to the property at issue. The property presented for valuation in Vesper, however, differs from that presented in the instant cases in that the taxpayers in Vesper donated unimproved land, rather than improved gravesites, to a city, which the city used to operate a cemetery. Unlike the property *358 presented for valuation in the instant cases, unimproved land for utilization by a cemetery could be sold in a resale market. Accordingly, respondent's reliance upon Vesper is inappropriate. Having identified the appropriate market to use for valuing the gravesites at issue, we must next determine the price at which the gravesites would be exchanged between a willing seller and an ultimate consumer, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs; sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Petitioners assert that the fair market value of the donated gravesites is the aggregate retail price of a single gravesite sold to and purchased by an individual for personal consumption, which petitioners' expert witness concludes was $ 504 in 1985 and $ 538 in 1986. Petitioners have presented no evidence of any sales involving such a large number of gravesites which have occurred at the aggregate retail price of a single gravesite, and we do not believe that such an exchange would occur at this price between reasonable, knowledgeable parties. Mr. Arneson's expert witness *359 report indicates that single gravesites located in cemeteries near Good Shepherd sold on a pre-need basis for as low as $ 275 in 1985 and $ 330 in 1986. Mr. Lukens testified that to his knowledge cemeteries do negotiate the price at which gravesites sell. The record reveals that for promotional purposes, Good Shepherd periodically gave gravesites away, offered gravesites at a discounted price if purchased as part of its family package plan, sold gravesites for less than their listed retail sale price prior to 1984, and exchanged 13,200 sites with the investors in D&E at a discount of approximately 96 percent off the listed retail sale price. [8] Common sense tells us that a reasonable buyer with knowledge of these aforementioned facts would not purchase such a large number of gravesites as presented in the instant cases at the aggregate retail prices of $ 504 and $ 538 in 1985 and 1986, respectively, and therefore an exchange of such a large number of gravesites would not occur between reasonable, knowledgeable parties at these prices. Accordingly, we reject petitioners' contention that the fair market value of the donated gravesites at issue is equal to the aggregate retail price *360 of $ 504 per gravesite in 1985 and $ 538 per gravesite in 1986. In cases, as in the instant cases, where both parties have made errors in valuation, the Court has made a determination of the fair market value of donated property based solely upon the taxpayer's cost. See Goldstein v. Commissioner, 89 T.C. 535, 547 (1987); Lio v. Commissioner, 85 T.C. 56, 71 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); *361 Chiu v. Commissioner, 84 T.C. 722, 734-736 (1985). [9] Under almost identical circumstances in Weiss v. Commissioner, T.C. Memo. 1993-228, Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67, and Broad v. Commissioner, T.C. Memo. 1986-340, involving the valuation of multiple gravesites in Ohio and Pennsylvania which were donated to charitable organizations, we rejected the experts' valuations and found the fair market value of the gravesites to be equal to the taxpayers' cost. Nine days prior to the date Mr. Lucente donated *362 gravesites in 1985, he acquired them at a cost of $ 34,200, [10] *363 and five days prior to the date the Klavans donated gravesites in 1986, they acquired them at a cost of $ 13,301. [11] Petitioners have presented no evidence indicating that the fair market value of the donated gravesites exceeded their cost in acquiring them. [12] Deductions are strictly a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed. Rule 142(a); Indopco, Inc. v. Commissioner, 503 U.S.     112 S. Ct. 1039, 1043 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Because petitioners have failed to do so, we conclude that the fair market value of the donated property on the date of donation was the cost of the property to petitioners; i.e. $ 34,200 to Mr. Lucente and $ 13,301 to the Klavans. [13]
*364 Issue 3. Entitlement to Long-Term Capital Gains Deduction
The Lucentes reported a long-term capital gain of $ 165,555 in 1985 on their exchange of unimproved land for 450 finished gravesites, and the Klavans reported a long-term capital gain of $ 63,332 in 1986 on their exchange of unimproved land for 175 gravesites. Petitioners claim and respondent concedes that if we redetermine the value of the donated gravesites for purposes of petitioners' charitable deduction, petitioners are entitled to have the same value used for determining the reported capital gain on the exchange of unimproved gravesites for improved gravesites. As we have determined a fair market value different from that claimed by petitioners on their respective tax returns, a corresponding adjustment to their reported capital gain is to be reflected in the Rule 155 computations. On brief, respondent asserts several arguments as to why petitioners are not entitled to a capital gains deduction pursuant to section 1202(a) in regard to their exchanges of unimproved land for finished gravesites. [14] Petitioners again contend that respondent did not fully raise this issue for the first time until filing a brief, *365 and therefore the issue is not properly before the Court. Again, it is a well-established rule that this Court will generally not address new issues raised for the first time in a party's brief if consideration of the theory will result in prejudice to the opposing party. Seligman v. Commissioner, 84 T.C. 191, 196-198 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Robertson v. Commissioner, 55 T.C. 862, 865 (1971); Philbrick v. Commissioner, 27 T.C. 346, 353 (1956); *366 Hettler v. Commissioner, 16 T.C. 528, 535 (1951); Wentworth Manufacturing Co. v. Commissioner, 6 T.C. 1201, 1208 (1946). The rule precluding addressing issues first raised on brief is founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 403-404 (1991); Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990); Graham v. Commissioner, 79 T.C. 415, 423-424 (1982). This Court has many times [15] admonished respondent of the limitations on raising new issues and new theories by the following quotation from Commissioner v. Transport Manufacturing & Equipment Co., 478 F.2d 731, 736 (8th Cir. 1973), affg. Riss v. Commissioner, 57 T.C. 469 (1971): the longer *367 the Commissioner delays in not expressly advising the taxpayer of the intended theories, the more reason there is to conclude that the taxpayer has not received fair notice and has been substantially prejudiced so as to deny the Commissioner consideration of theories raised for the first time in post trial briefs. The Commissioner may avoid this uncertainty and discharge his duty of informing the taxpayer by expressly notifying the taxpayer of the intended theories in the deficiency notice and the Commissioner's answer.
*368 While respondent does advert to the issue of petitioners' entitlement to a capital gains deduction in a trial memorandum and at trial, the issue was not raised in the notices of deficiency or pled by respondent in the answers to petitions or amended answers to petitions. This issue does not simply narrow any broad issues originally determined or pled by respondent but rather raises a completely new issue. The evidence required to prove petitioners' entitlement to this deduction differs from that required to resolve the issues raised by respondent in the notices of deficiency and answers to petitions and increases the amount of the deficiencies originally determined against petitioners. We conclude that petitioners would be prejudiced if we were to address the issue of whether they are entitled to a section 1202(a) capital gains deduction, and therefore we will not address this issue further. Issue 4. Deduction for Tax Consulting Fees
Section 212(3) allows a deduction for all ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax. Generally, ordinary and necessary expenses paid for Federal income tax planning *369 are deductible under section 212(3). Zmuda v. Commissioner, 79 T.C. 714, 725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Pursuant to a retainer agreement, each investor purchasing a limited partnership interest in D&E was required to pay a fee to Elgart, Dickler, and Co. in the amount of $ 7,800 per partnership unit in 1985 and $ 9,950 in 1986. Petitioners contend that these expenses were for the rendition of tax advice in regard to their participation in the exchange and contribution program, and therefore are deductible pursuant to section 212(3). It is clear from the record, however, that the primary services rendered to petitioners by Elgart pursuant to the retainer agreement consisted of facilitating the exchange and contribution program, rather than tax consulting and planning. Elgart stated that the retainer fee was charged not only for rendering tax advice, but was also charged for notifying investors and donees of the exchange and contribution program, facilitating the exchange of unimproved land for finished gravesites, receiving and transferring fees to FGV, and arranging for an appraiser and donee churches *370 to complete Forms 8283. Elgart spent an equal amount of time advising each investor regardless of whether the investor purchased a full or a fractional unit of investment; therefore, the retainer fee was not related to the amount of tax advice Elgart was required to render. The retainer fee was, however, directly related to the amount of work that Elgart was required to perform in facilitating the program as the investors were required to pay a higher fee if they elected to accelerate their exchange and contribution activity or if they purchased more than one unit of investment which entitled them to exchange and donate more than 225 gravesites. Elgart did, however, render advice to or on behalf of petitioners regarding the tax effects of investing in D&E and participating in the exchange and contribution program. Accordingly, a portion of the fees paid to Elgart, Dickler,and Co. by petitioners pursuant to the retainer agreement is allowable as a deduction under section 212. Regarding the Lucentes, Mr. Lucente claimed a tax consulting fee deduction in 1985 for the $ 15,600 paid to Elgart, Dickler, and Co. pursuant to the retainer agreement. Respondent disallowed one-half of *371 this deduction by notice of deficiency and the other one-half by amended answer. Accordingly, the Lucentes have the burden of proof as to their entitlement to one-half of the tax consulting fee deduction claimed by them, and respondent has the burden of proof as to the other half. Rule 142(a); Perry v. Commissioner, 92 T.C. 470, 478 n.14 (1989) (citing Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981)), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990). The record sufficiently indicates that the primary services rendered by Elgart to Mr. Lucente were not tax consulting services, and therefore the majority of the retainer fees paid by him are not deductible pursuant to section 212(3). We hold that the Lucentes are entitled to a tax consulting fee deduction in taxable year 1985 in the amount of $ 2,000. Regarding the Klavans, they paid Elgart, Dickler, and Co. the amount of $ 10,272 in 1986 pursuant to the retainer agreement and claimed a tax consulting fee deduction in the amount of $ 7,985. Because respondent disallowed the tax consulting fee deduction claimed by the Klavans by *372 the amended answer, respondent has the burden of proof on this issue. Rule 142(a); Perry v. Commissioner, supra at 478 n.14. Again, the record sufficiently indicates that the primary services rendered by Elgart to the Klavans were not tax consulting services, and therefore the majority of the retainer fees paid by them are not deductible pursuant to section 212(3). Because the Klavans, unlike Mr. Lucente, relied exclusively on Elgart for tax advice, it is reasonable to conclude that they received more tax advice from Elgart than did Mr. Lucente and accordingly are entitled to a larger tax consulting fee deduction. We hold that the Klavans are entitled to a tax consulting fee deduction in taxable year 1986 in the amount of $ 4,000. Issue 5. Additions to Tax for Negligence
Respondent determined by notice of deficiency or asserted by amended answer that petitioners' underpayments of income taxes in 1985 and 1986, respectively, were due to negligence or intentional disregard of rules or regulations and, accordingly, determined that petitioners were liable for the negligence additions to tax pursuant to section 6653(a)(1) and (a)(1)(A) and *373 section 6653(a)(2) and (a)(1)(B). Negligence under section 6653(a) means lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Both the Klavans and the Lucentes contend that they are not liable for these additions to tax because they reasonably relied upon the advice of a financial adviser regarding how to properly report the tax consequences of the exchange and contribution program. Reasonable reliance on the advice of competent tax counsel fully informed as to the relevant facts has been held to be sufficient to avoid the imposition of the addition to tax for negligence. Weis v. Commissioner, 94 T.C. 473, 487 (1990); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S. Ct. 2631 (1991); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); Woodbury v. Commissioner, 49 T.C. 180, 200 (1967). *374 The record indicates that Mrs. Lucente played no part in her husband's acquiring of an investment in D&E. Mr. Lucente does not consider himself an expert in the real estate or cemetery industry and does not consider himself a sophisticated investor. Mr. Lucente is not a tax professional, does not appear to have an extensive background in investing, and relied upon Richard Spoor, a tax adviser with whom he had a longstanding relationship, on all financial matters, including investing in D&E and participating in the exchange and contribution program. For approximately 2 months, Spoor carefully and thoroughly investigated the exchange and contribution program; his investigation included reviewing investment documents, talking with Elgart, seeking the advice of another tax consultant, and running pro forma tax returns to see the implications on the Lucentes' tax return. Mr. Lucente, who wanted assurance prior to investing in D&E that the exchange and contribution program would be approved by the IRS, received such assurance from Spoor, who assured him that a similar program had been approved by the IRS and, thus, there were no tax risks involved. Mr. Lucente relied on Spoor's advice *375 in regard to the proper reporting of his investment for tax purposes. Moreover, Elgart, Dickler and Co. prepared the Lucentes' 1985 Federal tax returning containing the erroneous deductions. The Klavans also do not consider themselves to be sophisticated businesspersons, and Mr. Klavan does not consider himself an expert in the real estate or cemetery business. The Klavans are not tax professionals, do not appear to have an extensive background in investing, and relied upon Elgart with whom they had a longstanding relationship regarding investing in D&E and participating in the tax and exchange program. Mrs. Klavan had received assurance from Elgart that the program had already been approved by the IRS, and she did not feel it was necessary to contact an independent tax counsel in regard to the investment. While Mr. Klavan considered seeking the advice of an independent accountant or attorney, he elected not to because he trusted and respected Elgart's advice. The Klavans relied upon the advice of Elgart in connection with their investment in D&E. Moreover, Elgart, Dickler and Co. prepared the Klavans' 1986 Federal tax return containing the erroneous deductions. The United *376 States Supreme Court, in United States v. Boyle, 469 U.S. 241, 251 (1985), stated the following: When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * *
We find that both Mr. Lucente and the Klavans reasonably relied upon the advice of a financial adviser regarding investing in D&E and reporting the attendant tax consequences of their investment. Therefore, petitioners are not liable for the negligence additions to tax determined against them in respondent's notices of deficiency or asserted by amended answers. Issue 6. Addition to Tax for a Substantial Understatement
Respondent determined by notice of deficiency or asserted by amended answer that petitioners are liable for *377 the addition to tax for a substantial understatement pursuant to section 6661. The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to the substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 501-503 (1988). A "substantial understatement" occurs when an "understatement" exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on a return. Sec. 6661(b)(1)(A). An "understatement" means the excess of the amount of the tax required to be shown on a return (reduced by any rebates within the meaning of section 6211(b)(2)). Sec. 6661(b)(2)(A). In the instant cases, we have determined that both the Lucentes and the Klavans have understated their income tax liabilities in the years at issue. Petitioners contend, however, that they are not liable for the section 6661 addition to tax because their understatements should be reduced pursuant to section 6661(b)(2)(B) for purposes of applying the section 6661 addition *378 to tax. Section 6661(b)(2)(B) provides for the reduction of an understatement by that portion of the understatement which is attributable to either: (1) The tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment; or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. However, if the item which causes the understatement is attributable to a "tax shelter" as defined in section 6661(b)(2)(C)(ii), which is clearly present in the instant cases, there will be no reduction in the understatement unless (1) the tax treatment of the item used is supported by "substantial authority" and (2) the taxpayer believed that the tax treatment of such item was "more likely than not" the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II). Section 1.6661-3(a)(2), Income Tax Regs., indicates that the "more likely than not" standard means greater than a 50-percent likelihood of being upheld in litigation. This standard is more stringent than the standard to avoid the negligence additions to tax under section 6653, i.e., reasonableness. Sec. *379 1.6661-3(a)(2), Income Tax Regs.
In the instant cases, both the Klavans and Mr. Lucente received a copy of the confidential private placement memorandum supplied by D&E. This memorandum devotes several pages to a discussion of the tax risks involved and indicates the likelihood of an attack by respondent. Under these circumstances, we are unable to conclude that petitioners could reasonably have believed that they were more likely than not entitled to the charitable contribution and tax consulting fee deductions claimed by them in the years in issue. [16] See Weintrob v. Commissioner, T.C. Memo. 1990-513, supplemented by T.C. Memo. 1991-67. Accordingly, the amount of petitioners' understatements should not be reduced pursuant to section 6661(b)(2)(B) for purposes of applying the section 6661 addition to tax. [17]
*380 Notwithstanding the above, the Secretary may waive all or part of the section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). In the instant cases, the Klavans specifically requested a waiver of this addition to tax subsequent to filing their petition, and while there is no indication that the Lucentes made such a request, we were able to infer that such a request was made given that, through the course of this litigation, they have attempted to establish that they acted reasonably and in good faith. See Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). The express language of section 6661(c) may appear to give the Secretary unbridled discretion in determining whether or not to waive the section 6661 addition to tax; however, we may review the Secretary's decision for an abuse of discretion. Mailman v. Commissioner, supra at 1083-1084. Our review of the Commissioner's decision not to waive this addition to tax is limited to whether the Commissioner's discretion has been exercised arbitrarily, *381 capriciously, or without sound basis in fact. Id. at 1084; Smith v. Commissioner, 91 T.C. 733 (1988), affd. sub nom. Karr v. Commissioner, 924 F.2d 1018, 1026 (11th Cir. 1991). The administrator's judgment and ability to provide uniform treatment to similarly situated taxpayers deserves our deference, and the question for the Court is not whether it would have decided the matter differently from respondent but whether respondent's not granting petitioners' request was arbitrary. Mailman v. Commissioner, supra at 1084. Petitioners have the burden of persuading us that, in refusing to waive the addition to tax, respondent has exercised this discretion "arbitrarily, capriciously, or without sound basis in fact." Id.; see Fisher v. Commissioner, T.C. Memo. 1992-740. Petitioners' burden is a heavy one and is certainly greater than their burden of proving absence of negligence. Casalina Corp. v. Commissioner, 60 T.C. 694, 701 (1973), affd. per curiam 511 F.2d 1162 (4th Cir. 1975); *382 see also Weintrob v. Commissioner, T.C. Memo. 1991-67. Petitioners contend that respondent abused her discretion in the instant cases by not waiving the section 6661 additions to tax because they reasonably relied in good faith upon tax counsel regarding reporting the tax consequences of their investment in D&E. In determining whether petitioners had reasonable cause and acted in good faith, we look primarily to the extent of their efforts to assess their proper tax liability under law. Mailman v. Commissioner, supra at 1084; sec. 1.6661-6(b), Income Tax Regs. Reliance on professional advice would constitute a showing of reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6661-6(b), Income Tax Regs.
The Courts of Appeals for the Fifth Circuit and the Ninth Circuit recently held that the Commissioner abused her discretion in failing to waive the addition to tax under section 6661 based on a record that showed the taxpayer's reasonable reliance on a financial adviser and an accountant. Vorsheck v. Commissioner, 933 F.2d 757 (9th Cir. 1991), *383 affg. in part and revg. in part an Oral Opinion of this Court; Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. In accordance with Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971), this Court in English v. Commissioner, T.C. Memo. 1993-111, followed the decision of the Court of Appeals for the Fifth Circuit in Heasley, and in Erhard v. Commissioner, T.C. Memo. 1992-376, followed the decision of the Court of Appeals for the Ninth Circuit in Vorsheck holding that the Commissioner abused her discretion in failing to waive the section 6661 addition to tax upon a showing of reasonable reliance upon a financial adviser. The instant cases are appealable in the Second and the Third Circuits; therefore, we are not bound by the decisions in the Fifth and the Ninth Circuits in Heasley and Vorsheck, respectively. Nevertheless, we find that petitioners were more experienced and sophisticated than the investors in Vorsheck *384 and Heasley. Further, petitioners were well aware of the tax risks involved in participating in the exchange and contribution program. Nevertheless, we recognize that petitioners are not tax professionals, none appear to have an extensive background in investing, and each relied upon a tax adviser with whom he or she had a longstanding relationship regarding whether to participate in the program and how to thereafter report its attendant tax consequences. We cannot conclude, however, that respondent acted arbitrarily in refusing to waive the section 6661 addition to tax solely on this basis. In Weintrob v. Commissioner, T.C. Memo. 1991-67, involving circumstances almost identical to the instant cases, we held that the taxpayers had not carried their burden of proving that the Commissioner had abused her discretion in refusing to waive the section 6661 addition to tax. In the instant cases, respondent's refusal to waive the addition to tax determined against the Klavans was based upon this Court's decision on the same issue in Weintrob. Unable to distinguish the facts of Weintrob from those present in regard to the Klavans, respondent *385 found no grounds to waive the addition to tax as to the Klavans; however, respondent indicated that if the Klavans presented more facts during the trial preparation, respondent would reconsider a waiver request. We assume that respondent's reasons for failing to waive the addition as to the Lucentes would be premised upon the same basis. While we might have decided the instant matter differently from respondent, our review of respondent's decision is limited to whether respondent exercised his discretion arbitrarily, capriciously, or without sound basis in fact. Given the existence of almost identical factual circumstances as presented in Weintrob, we are not convinced that respondent's refusal to waive the section 6661 additions to tax was arbitrary, capricious, or without sound basis in fact. Respondent's conclusion in the instant cases to adhere to our decision in Weintrob indicates a desire to treat similarly situated taxpayers in a uniform manner, and this judgment deserves our deference. Accordingly, if after making the Rule 155 computations, petitioners' understatements are substantial as defined in section 6661, we hold that petitioners are liable for this addition *386 to tax. Issue 7. Section 6621(c) Additional Interest
Section 6621(d) provides for interest at the rate of 120 percent of the normal rate (under section 6601) on "substantial underpayments attributable to tax-motivated transactions". A "substantial underpayment attributable to a tax-motivated transaction" means any underpayment of tax which is attributable to one or more "tax-motivated transactions" if the amount of the underpayment for such year so attributable exceeds $ 1,000. Sec. 6621(d)(2). A "tax-motivated transaction" includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(d)(3)(A)(i). Pursuant to section 6659(c)(1), a valuation overstatement occurs where the value of any property or adjusted basis of property claimed on any return is 150 percent or more of the value or adjusted basis that is determined to be the correct amount. For purposes of calculating both their charitable contribution deduction and the taxable gain recognized on the exchange of unimproved land for finished gravesites, the Lucentes reported that the 450 gravesites exchanged and donated had a fair market value of $ 182,655, and the Klavans reported that the 175 *387 gravesites exchanged and donated had a fair market value of $ 71,033. Because we have determined that the correct fair market value of the Lucentes' 450 gravesites was $ 34,200, and that the correct fair market value of the Klavans' 175 gravesites was $ 13,301, a valuation overstatement has occurred in these cases. Accordingly, if the amount of petitioners' underpayments that are attributable to these valuation overstatements exceeds $ 1,000, they are liable for the increased rate of interest provided by section 6621(d) on the portion of the understatements so attributable. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Edward E. and Helaine F. Lucente, docket No. 2181-91; and Scott R. Sanders and Patricia B. Sanders, docket No. 16970-91.↩
1. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence pursuant to sec. 6653(a)(1)(B).↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence pursuant to sec. 6653(a)(2).↩
1. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence pursuant to sec. 6653(a)(2) and (a)(1)(B).↩
3. In addition to petitioners, the following persons or entities purchased limited partnership interests in D&E: Paul Barsky, Louis Beck, William Bowles, Lewis Burns, John DiCuollo, George Finkel, Merrell Hansen, Reginald C. Johns, Richard Jubanyik, Robert Kaskey, William C. Koch, Kenneth Lees, Marvin I. Lessin, Marvin Lundy, Donald Manchel, Michael Marks, Leonard and Linda Miller, Barre Monigold, Joseph A. Rhode, Norman Rosen, Seymour Rosenberg, Irwin Ross, Edward Shapiro, Barry Shaw, Michael Silverberg, Brooke Spectorsky, William Tanner, Michael Varbalow, and Donald C. Young.↩
4. Pursuant to the agreement of sale, Elgart and Dickler had the option of purchasing an additional 12 acres of unimproved land situated within Good Shepherd. In 1986, D&E partially exercised this option, and by a deed dated June 6, 1986, and recorded June 9, 1986, Good Shepherd conveyed 5.98 acres of unimproved land to FGV. This property was not utilized in the 1986 exchange and contribution program. Elgart and Dickler never exercised its option to purchase the additional 6 acres of unimproved land.↩
5. Inexplicably, the Klavans paid more to Elgart, Dickler, and Co. than was required pursuant to the retainer agreement and then only deducted a portion of the amount actually paid.↩
6. Respondent contends that because FGV did not deed the unimproved land involved in the 1986 exchange program to Good Shepherd until July 16, 1987, the Klavans did not receive the gravesites prior to this date and, therefore, could not have donated the gravesites on Dec. 26, 1986, as alleged. However, the record indicates that FGV conveyed the unimproved land to the Klavans prior to their Dec. 26, 1986, donation. That is, the Klavans requested a withdrawal of unimproved land from FGV on Dec. 16, 1986, and exchanged it with Good Shepherd for finished gravesites on Dec. 21, 1986.↩
7. Mr. Arneson prepared a prior expert report in which he utilized the income approach to valuing the property at issue. After acquiring a copy of sec. 20.2031-1(b), Estate Tax Regs., he realized he had used an improper market in which to value the donated gravesites and accordingly amended his report.↩
8. The listed retail sales price of a gravesite located in Good Shepherd was $ 495 in 1985 and 1986. The unimproved land received by Good Shepherd had a basis of approximately $ 4 per gravesite exchanged, and Good Shepherd received a $ 15 processing fee per gravesite exchanged. Thus, Good Shepherd exchanged 13,200 gravesites with a listed retail price of $ 495 with the investors in D&E for approximately $ 19 in consideration, a discount of approximately 96 percent off the listed retail price.↩
9. See also Schachter v. Commissioner, T.C. Memo. 1986-292; Lampe v. Commissioner, T.C. Memo. 1985-236; Theodotou v. Commissioner, T.C. Memo. 1985-181; Talebi v. Commissioner, T.C. Memo. 1985-180↩.
10. Mr. Lucente paid a processing fee equal to $ 32 per gravesite to acquire the 450 gravesites, and on his and Mrs. Lucente's 1985 Federal tax return reported that the unimproved land exchanged for the gravesites had a basis equal to $ 17,100. Therefore, Mr. Lucente's cost to acquire the 450 gravesites equaled the $ 17,100 basis in the unimproved land increased by $ 14,400; i.e., $ 32 per gravesite.↩
11. The Klavans paid a processing fee equal to $ 38 per gravesite to acquire the 175 gravesites, and on their 1986 Federal tax return reported that the unimproved land exchanged for the gravesites had a basis equal to $ 7,701. Therefore, the Klavans' cost to acquire the 175 gravesites equaled the $ 7,701 basis in the unimproved land increased by $ 6,650; i.e., $ 38 per gravesite.↩
12. For this reason, the instant cases are distinguishable from Waterman v. Commissioner, T.C. Memo. 1975-209 and Grossman v. Commissioner, T.C. Memo. 1973-219, on which petitioners rely to support their contention that petitioners' cost in acquiring the finished gravesites is not indicative of their fair market value. That is, unlike the record in the instant cases, the records in Waterman and Grossman↩ contained evidence indicating that the fair market value of the property presented for valuation exceeded the taxpayer's cost in acquiring the property.
13. Because we have determined that the fair market value of the gravesites was equal to petitioners' cost in acquiring the gravesites, petitioners would have recognized no gain on the sale of the finished gravesites. Secs. 732(a)(1), 1001(a) and (b), 1011(a), 1012, 1016(a)(1). Accordingly, we need not address respondent's contention that the amount of each petitioner's charitable contribution deduction shall be reduced pursuant to sec. 170(e)(1)(A) by the sum of the amount of gain which would not have been long-term capital gain if the property contributed had instead been sold by petitioners at its fair market value.↩
14. Notwithstanding our holding supra↩ note 13 that there would be no gain realized on the sale of finished gravesites, petitioners would realize a gain on the exchange of unimproved land for finished gravesites as the basis in the unimproved land, for purposes of determining the value of the land upon sale or exchange, unlike the basis in the finished gravesites, would not be adjusted pursuant to sec. 1016(a) for costs incurred to acquire the property. Secs. 1011(a), 1012, 1016(a).
15. E.g., Leahy v. Commissioner, 87 T.C. 56 (1986); Seligman v. Commissioner, 84 T.C. 191 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Schuster's Express, Inc. v. Commissioner, 66 T.C. 588 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977); Muserlian v. Commissioner, T.C. Memo. 1989-493, affd. 932 F.2d 109↩ (2d Cir. 1991).
16. We reach this conclusion even though Spoor told Mr. Lucente that there were no tax risks involved.↩
17. Because the intent standard for relief under sec. 6653 is lower than that under sec. 6661(c), our conclusion on this sec. 6661(c) issue is not inconsistent with our determination that petitioners were not liable for the negligence additions to tax.↩